(317 P.3d 794)
No. 109,759

STATE OF KANSAS, *Appellant*, v. ARYANNA PHILATINA DECLERCK, *Appellee*.

Opinion filed February 7, 2014.

*Jodi Litfin* and *Jose V. Guerra*, assistant district attorneys, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Reid T. Nelson*, of Capital and Conflicts Appeals Office, for appellee.

Before POWELL, P.J., ATCHESON, J., and ERNEST L. JOHNSON, District Judge Retired, assigned.

POWELL, J.: In this appeal, we confront the question of whether drivers on our state's highways relinquish their Fourth Amendment rights under Kansas' implied consent statute. Following a single-vehicle fatality accident and as allowed by statute, an officer directed medical personnel to withdraw blood without a warrant from the driver of the vehicle, Aryanna Declerck, despite her refusal. After receiving the blood test results, the Shawnee County District Attorney charged Declerck with involuntary manslaughter-DUI, a severity level 4 person felony. Declerck filed two motions to suppress, alleging the blood test results were obtained without a warrant and without probable cause. After a hearing, the district court granted Declerck's motions.

The State subsequently filed this interlocutory appeal concerning the suppression of evidence, arguing (1) K.S.A. 2011 Supp. 8-1001 clearly authorized the blood draw, (2) the consent exception to the warrant requirement was met because Declerck had impliedly consented to the blood draw under Kansas' implied consent statute, and (3) even if the search was prohibited by the Fourth Amendment, the good faith exception should apply to allow admission of the blood test results because law enforcement reasonably relied on the statute when obtaining Declerck's blood.

We hold that the warrantless blood draw, though done in accordance with K.S.A. 2011 Supp. 8-1001, violated Declerck's Fourth Amendment rights because it was not done pursuant to

probable cause that Declerck had been operating her motor vehicle while under the influence of drugs or alcohol and because Declerck's implied consent to such a blood draw under Kansas' implied consent statute did not constitute consent for the purposes of a valid exception to the warrant requirement under the Fourth Amendment. We decline to address the State's good faith exception argument, asserted for the first time on appeal, because the State did not establish an adequate record below plus there are disputed facts which prevent us from properly addressing this question. Accordingly, we affirm the district court.

## FACTUAL AND PROCEDURAL HISTORY

On November 5, 2011, at approximately 2 p.m., Declerck was involved in a single vehicle fatality accident in which she was the driver. The passenger, Shaylee Oxy, who was not wearing her seatbelt, was ejected from the vehicle and ultimately died from her injuries. The State subsequently charged Declerck with involuntary manslaughter while driving under the influence of alcohol or drugs pursuant to K.S.A. 2011 Supp. 21-5405(a)(3), a severity level 4, person felony.

At the preliminary hearing, two witnesses of the accident, Tom Parish and Gregory Roy; phlebotomist Dave Cunningham, Jr.; Larry Mann from the Kansas Bureau of Investigation (KBI) Forensic Laboratory; Officer Dominic Yancy; and lead investigator Trooper Marcus Seirer testified.

Parish testified he was heading eastbound on I-470 on November 5, 2011, when he noticed a black pickup truck coming off the right shoulder in front of him. He described Declerck's driving as "very reckless."

Next, Roy testified he was behind Declerck's truck in the left turn lane on 21st street waiting to turn onto I-470. He followed Declerck as she merged onto the highway and stayed in the right lane. There was a small sedan to the left and a vehicle in front of Declerck. Her truck slowly started to drift over to the left, so Roy slowed down because he thought Declerck's truck was going to make contact with the sedan. The truck all of a sudden swerved over to the right and out of the lane slightly onto the right shoulder.

The truck then quickly whipped back to the left and crossed into the left lane. Declerck started to lose control and whipped back to the right. Declerck appeared to overcorrect; the truck's left rear tire caught the turf or median, and the vehicle began to barrel roll. Clothes and other debris flew out of the truck and littered the road. As Roy drove past the accident, he noticed an individual lying on the ground. The sedan pulled over to the right side of the road; Roy parked in front of the sedan and exited his vehicle. Roy headed towards the accident scene and noticed the driver of the sedan was still in his vehicle. Roy made a mental note of the sedan's tag. The sedan drove off. Roy immediately approached an officer and told him that a vehicle involved in the accident drove off. The officer handed him a clipboard and asked him to record what he had seen. Roy said there was nothing irregular or reckless about Declerck's driving.

Declerck was transported to Stormont-Vail Hospital as a result of the injuries she sustained in the accident. Seirer requested an officer obtain a blood draw from Declerck pursuant to K.S.A. 2011 Supp. 8-1001—a traffic fatality occurred and Declerck could have been cited for a traffic offense. Yancy went to Stormont-Vail to obtain a blood draw. He read and provided a copy of the Implied Consent Advisory to Declerck, but she declined to provide a blood sample.

Yancy contacted his supervising officer, who was at the scene of the accident, regarding Declerck's declination. The officer directed Yancy to proceed with a custodial blood draw.

Cunningham drew Declerck's blood pursuant to Yancy's request. Cunningham gave the blood sample to Yancy who later submitted it to the KBI for testing. Mann reviewed the lab results and testified there were marijuana chemicals in Declerck's blood. He indicated based on the levels of THC—a psychoactive substance found in marijuana—in Declerck's blood, there was some level of impairment.

At the conclusion of the preliminary hearing, the district court bound Declerck over for trial.

Shortly thereafter, Declerck filed two motions to suppress evidence. The first motion dealt with law enforcement's failure to seek

a search warrant prior to drawing her blood. The motion alleged, *inter alia*, there were no exigent circumstances present to excuse the warrant requirement. The second motion alleged law enforcement did not have probable cause to believe Declerck was under the influence of drugs.

The district court held a suppression hearing on the two motions. The State conceded the officers did not have probable cause to support a request for a warrant. Nonetheless, the State argued the blood draw was legal pursuant to K.S.A. 2011 Supp. 8-1001(b)(2), which provides an officer shall request a test in the event of a vehicle accident that results in serious injury or death and the driver could be cited for any traffic infraction. Yancy and Seirer testified similar to their preliminary hearing testimony.

Yancy testified he read Declerck her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), after the blood draw, and she declined to speak to him. Yancy testified he was with Declerck for an hour and did not notice any signs of impairment.

Seirer testified that he arrived on the accident scene after Oxy and Declerck had been transported to Stormont-Vail. At approximately 3:17 p.m., while at the scene of the accident, Seirer learned that Oxy had passed away. At 4:21 p.m. he drove to Stormont-Vail to take a statement from Declerck. Before he met with Declerck, he talked to Yancy who was on his way out of the hospital. Yancy told Seirer that a blood draw had been taken and Declerck invoked *Miranda*. Seirer proceeded to Declerck's hospital room and told her that Oxy had passed away.

Upon a search of Declerck's truck, Officer Shawn Taylor found rolling papers and marijuana in a purse that also contained Oxy's driver's license. Based on eyewitness accounts and Seirer's own investigation, he concluded that Declerck attempted to pass a white vehicle, then for some unknown reason lost control of the vehicle, entered the grassy median, and then rolled multiple times. Seirer testified that Declerck could have been cited for unsafe lane change and failure to maintain a single lane of traffic. However, Seirer's conclusion did not indicate that Declerck was impaired from drugs or alcohol.

At the conclusion of the hearing, the district court granted the State's request for additional time to file a written response to Declerck's motion and to review recent caselaw. The district court also allowed Declerck to file a reply to the State's brief.

In the State's response to Declerck's motions to suppress, it once again argued law enforcement had the authority to draw Declerck's blood pursuant to K.S.A. 2011 Supp. 8-1001(b)(2)—if a vehicle has been involved in an accident involving serious injury or death and the driver could be cited for any traffic infraction—and K.S.A. 2011 Supp. 8-1001(d)(3)—law enforcement can direct medical professionals to draw blood from a person if the person refuses and the person meets the requirements of K.S.A. 2011 Supp. 8-1001(b)(2). Declerck's reply brief again argued the evidence from the blood draw should be suppressed because she was not under arrest, no warrant was issued, and officers lacked probable cause to believe she was driving under the influence.

On March 27, 2013, the district court issued a memorandum decision and order granting Declerck's motions to suppress. The court concluded officers had authority to order a blood draw pursuant to K.S.A. 2011 Supp. 8-1001(b)(2) and K.S.A. 2011 Supp. 8-1001(d)(3) but, based on the facts presented, the blood draw violated the Fourth Amendment and the requirements set out in *Schmerber v. California*, 384 U.S. 757, 766-72, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). The court concluded that, based on the evidence, officers did not have probable cause to believe that Declerck had been driving under the influence of alcohol or drugs and suppressed the evidence from the blood draw.

On April 8, 2013, the State timely filed an interlocutory appeal challenging the suppression of the blood test.

## DID THE DISTRICT COURT PROPERLY GRANT DECLERCK'S MOTION TO SUPPRESS EVIDENCE OF THE BLOOD TEST?

### *Standard of Review*

When reviewing a motion to suppress evidence, appellate courts do not reweigh the evidence or reassess the credibility of the witnesses. An appellate court determines whether the factual findings underlying the district court's decision are supported by substantial

competent evidence. *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013). Substantial evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012). However, the ultimate legal conclusions drawn from those factual findings are reviewed de novo. *Martinez*, 296 Kan. at 485. The State bears the burden to prove to the district court the lawfulness of a warrantless search and seizure by a preponderance of the evidence. *State v. Pollman*, 286 Kan. 881, 886, 190 P.3d 234 (2008).

To the extent this appeal involves the constitutionality of K.S.A. 2011 Supp. 8-1001, appellate courts exercise unlimited review over questions of law. Moreover, appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Appellate courts must also interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the legislature's apparent intent. *State v. Seward*, 296 Kan. 979, 981, 297 P.3d 272 (2013).

*Analysis*

"Our state and federal Constitutions protect citizens from unlawful searches and seizures." *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010), *cert. denied* 131 S. Ct. 2114 (2011). The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"We interpret § 15 of the Kansas Constitution Bill of Rights to provide the same protection from unlawful government searches and seizures as the Fourth Amendment to the federal Constitution. [Citations omitted.] '[R]egardless of whether the statute is challenged under the federal or state Constitution, we consider ourselves bound by United States Supreme Court precedent.' [Citation omitted.]" 291 Kan. at 498.

"The extraction of a blood sample is both a search of the person and a seizure of an effect. The extraction implicates constitutional guarantees against unreasonable searches and seizures under the

Fourth and Fourteenth Amendments to the United States Constitution. *Schmerber v. California*, 384 U.S. [at] 767." *State v. Murry*, 271 Kan. 223, 226, 21 P.3d 528 (2001). Under the United States and Kansas Constitutions, a search conducted without a warrant is per se unreasonable, unless a specifically established exception applies. *State v. Damm*, 246 Kan. 220, 221, 787 P.2d 1185 (1990). Those exceptions include " 'consent; search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances; the emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses.' [Citation omitted.]" *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012).

In *Murry*, 271 Kan. at 227, our Supreme Court adopted the *Schmerber* three-part test to determine when a warrantless blood draw can be taken:

"(1) There must be exigent circumstances in which the delay necessary to obtain a warrant would threaten the destruction of the evidence; (2) the officer must have probable cause to believe that the suspect has been driving under the influence of alcohol; and (3) the procedures used to extract the blood must be reasonable."

However, "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, . . . it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1563, 185 L. Ed. 2d 696 (2013). "Probable cause to arrest is the reasonable belief, drawn from the totality of information and reasonable inferences available to the arresting officer, that the defendant has committed or is committing a specific crime." *State v. Johnson*, 297 Kan. 210, 222, 301 P.3d 287 (2013). "It is the State's burden to validate a warrantless search by fitting it within one of the recognized exceptions . . . ." 297 Kan. at 223.

### 1. *Did Probable Cause Exist to Justify the Blood Draw?*

Interestingly, other than consent, the State concedes probable . cause (as well as the other exceptions) did not exist to believe that

Declerck had operated or attempted to operate a motor vehicle while under the influence of drugs or alcohol at the time the custodial blood draw was taken. Instead, the State argues: "[P]robable cause is clearly set out by the statute [K.S.A. 2011 Supp. 8-1001(b)]." Accordingly, the State contends the second prong of the *Schmerber* test—probable cause to believe the suspect was driving under the influence—was met.

The statute at issue is K.S.A. 2011 Supp. 8-1001 and provides in relevant part:

"(a) Any person who operates or attempts to operate a vehicle within this state is deemed to have given consent . . . to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs. . . .

"(b) A law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a): . . . (2) if the person was operating or attempting to operate a vehicle and such vehicle has been involved in an accident or collision resulting in serious injury or death of any person and the operator could be cited for any traffic offense, as defined in K.S.A. 8-2117, and amendments thereto. *The traffic offense violation shall constitute probable cause* for purposes of paragraph (2)." (Emphasis added.)

The State argues that pursuant to the plain language of K.S.A. 2011 Supp. 8-1001(b)(2), Yancy and Seirer had probable cause to request a custodial blood draw because Declerck was involved in a traffic fatality accident and could have been cited with unsafe lane change and failure to maintain a single lane of traffic. However, the question on appeal is whether K.S.A. 2011 Supp. 8-1001 as enacted deprived Declerck of her rights guaranteed by the United States and Kansas Constitutions. See *Ybarra v. Illinois*, 444 U.S. 85, 96 n.11, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979) (legislature cannot abrogate a person's Fourth Amendment right to be free from unreasonable searches and seizures, and United States Supreme Court will not hesitate to hold such statutes unconstitutional); *State v. Lambert*, 238 Kan. 444, 450, 710 P.2d 693 (1985) (legislature cannot enact a statute that effectively deprives individuals of rights guaranteed by the United States Constitution); *Martin v. Kansas Dept. of Revenue*, 36 Kan. App. 2d 561, 566, 142 P.3d 735 (2006) (statute that defines rules in criminal, administrative,

and civil cases cannot stand if statute infringes on constitutional rights), *aff'd* 285 Kan. 625, 176 P.3d 938 (2008).

In 2008, the Kansas Legislature amended K.S.A. 8-1001 by limiting application of the phrase "[i]f the *officer has reasonable grounds to believe the person was operating or attempting to operate a vehicle while under the influence of alcohol or drugs*" to K.S.A. 8-1001(b)(1) and adding "[t]he traffic offense shall constitute probable cause for purposes of paragraph (2)" to K.S.A. 8-1001(b)(2) (Emphasis added.) L. 2008, ch. 170, sec. 1. "The reasonable grounds test of K.S.A. 2007 Supp. 8-1001(b) is strongly related to the standard for determining probable cause to arrest." *Johnson*, 297 Kan. at 222.

Our Supreme Court has held: "Despite statutory language authorizing the taking of the blood sample, any such bodily invasion must still be constitutionally sound." *Murry*, 271 Kan. at 226. The State argues the Kansas Legislature examined outside authority when formulating the amendments to K.S.A. 8-1001. The State cites Oklahoma Statute, Okla. Stat. tit. 47, § 10-104(B) (1998 Supp.)—Drug and alcohol testing, which states:

"B. Any driver of any vehicle involved in an accident who could be cited for any traffic offense where said accident resulted in the immediate death of any person shall submit to drug and alcohol testing as soon as practicable after such accident occurs. The traffic offense violation shall constitute probable cause for purposes of . . . this title . . . ."

Okla. Stat. tit. 47, § 10-104(B) (1998 Supp.) was upheld in *Guest v. State*, 2002 OK CR 5, ¶ 8, 42 P.3d 289 ("[I]t is enough that Appellant was the driver of a vehicle involved in an accident, that he could be cited for a traffic offense and that the accident resulted in the immediate death of a person. Appellant's blood was [not] withdrawn . . . in violation of his constitutional rights under the Fourth Amendment."). In *Bemo v. State*, 2013 OK CR 4, ¶¶ 4, 6, 298 P.3d 1190, the court noted the defendant did not properly raise a Fourth Amendment challenge to the admission of the blood test and ultimately found the blood draw was permissible because "[he] was the driver of a vehicle involved in a fatality accident; he could have been cited for a traffic offense . . . ; and . . . his blood was properly withdrawn under the provisions of § 10-104(B)."

We find our sister court's reasoning in *Guest* to be unsatisfying and, therefore, unpersuasive. The Court of Criminal Appeals of Oklahoma explained in detail how the blood draw in that case comported with the statute but then made the conclusory statement that the blood draw did not violate the Fourth Amendment. *Guest*, 2002 OK CR 5, ¶ 8. This opinion leaves us guessing as to how that is so because we still question how an injury or fatality accident by a driver who commits one or more traffic offenses, without more, constitutes probable cause that the driver was unlawfully impaired at the time he or she was operating a motor vehicle.

Moreover, every other state to consider this question, such as Alaska, Arizona, Georgia, Illinois, Indiana, Maine, Mississippi, and Pennsylvania, has found statutes similar to K.S.A. 2012 Supp. 8-1001(b) unconstitutional. See, *e.g.*, *State v. Blank*, 90 P.3d 156, 161-62 (Alaska 2004) (interpreted statute similar to K.S.A. 2011 Supp. 8-1001[b][2] to incorporate requirements of *Schmerber*); *State v. Quinn*, 218 Ariz. 66, 68, 178 P.3d 1190 (Ct. App. 2008) (statute cannot authorize blood draw following traffic accident involving serious injury or fatality absent probable cause driver impaired); *Cooper v. State*, 277 Ga. 282, 291, 587 S.E.2d 605 (2003) ("[T]o the extent [the statute] requires chemical testing of the operator of a motor vehicle involved in a traffic accident resulting in serious injuries or fatalities regardless of any determination of probable cause, it authorizes unreasonable searches and seizures in violation of the State and Federal Constitutions."); *King v. Ryan*, 153 Ill. 2d 449, 463-64, 607 N.E.2d 154 (1992) (officer needs more than probable cause driver partially at fault for death or injury accident to request blood test; probable cause driver under the influence required); *Hannoy v. State*, 789 N.E.2d 977, 992 (Ind. App. 2003) (law enforcement may forcibly obtain blood sample from driver without warrant or consent but only when they have probable cause to believe driver was intoxicated); *State v. Roche*, 681 A.2d 472, 472 n.1, 475 (Me. 1996) (statute prohibits use of evidence from administrative blood draw in criminal prosecution unless State can establish independent probable cause driver impaired at time of accident); *McDuff v. State*, 763 So. 2d 850, 855 (Miss. 2000) ("[T]he tragic fact that a fatality arises out of a motor

vehicle accident is in no way, standing alone, an indicator that alcohol or drugs were involved."); *Com. v. Kohl*, 532 Pa. 152, 164, 615 A.2d 308 (1992) (drawing blood sample pursuant to implied consent law from driver who had been involved in automobile accident violated Fourth Amendment when driver was not under arrest and no probable cause driver was operating vehicle under the influence).

In light of this overwhelming and persuasive authority, we must conclude K.S.A. 2011 Supp. 8-1001(b)(2) is unconstitutional to the extent it requires a search and seizure absent probable cause the person was operating or attempting to operate a vehicle under the influence of drugs or alcohol. We are acutely aware the statute in question attempts to address the terrible toll impaired drivers inflict on our state's highways, but we are reminded of the "truism that constitutional protections have costs." *Coy v. Iowa*, 487 U.S. 1012, 1020, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). While the State does have a significant interest in preventing accidents involving drugs and alcohol on the road, K.S.A. 2011 Supp. 8-1001(b)(2) does not further that interest. See *Hannoy*, 789 N.E.2d. at 984 (special needs exception inapplicable where search performed by law enforcement or for law enforcement purposes); *McDuff*, 763 So. 2d at 855 (statute with public safety and law enforcement purpose does not fall within special needs exception); see also *State v. Childs*, 275 Kan. 338, 347, 64 P.3d 389 (2003) (exclusive sanction for highly regulated business refusing entry to law enforcement is license revocation). A traffic infraction plus an injury or fatality, without more, does not constitute probable cause that drugs or alcohol were involved in the accident.

*2. Does the Kansas Implied Consent Law Provide Consent to a Blood Draw?*

Next, the State argues even if this court finds there was no probable cause, a valid exception to the warrant requirement applies—consent. Specifically, the State asserts that consent to a chemical test is given by every driver of a vehicle upon our state's roads under the conditions set forth in our implied consent statute. The State concedes that it did not raise this issue below and, generally,

constitutional issues cannot be raised for the first time on appeal. Nonetheless, the State argues two exceptions to the general rule apply: (1) the newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case and (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights. We agree. Accordingly, this court shall review the State's challenge for the first time on appeal because it involves a question of law and may be finally determinative of this case. See *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 (2008).

The State argues the Kansas implied consent statute is premised on the theory that anyone who operates a vehicle in Kansas consents in advance to submission to a chemical test to determine the amount of alcohol in the driver's blood. K.S.A. 2011 Supp. 8-1001(a) states in relevant part:

"Any person who operates or attempts to operate a vehicle within this state is deemed to have given consent, subject to the provisions of this act, to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs."

Moreover, the State, relying on precedent from our Supreme Court, contends "compulsory testing for alcohol or drugs through drivers' implied, even coerced, consent does not violate the Constitution; it is reasonable in light of the State's compelling interest in safety on the public roads." *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 635, 176 P.3d 938 (2008); see also *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 835, 888 P.2d 832 (1995) (purpose of implied consent law to coerce submission to chemical testing through threat of statutory penalties and admission into evidence in DUI proceeding fact of test refusal). The State further asserts that because our court has previously described the Kansas implied consent law as "remedial" and one which "should be liberally construed to promote the health, safety, and welfare of the public," *Kim v. Kansas Dept. of Revenue*, 22 Kan. App. 2d 319, 323, 916 P.2d 47, *rev. denied* 260 Kan. 994 (1996), a driver suspected of driving under the influence has no constitutional right to refuse a blood alcohol test. *State v. Bussart-Savaloja*, 40 Kan.

App. 2d 916, 927-28, 198 P.3d 163 (2008), *rev. denied* 288 Kan. 833 (2009).

We have no quarrel with these authorities—as far as they go. "But the fact that people are 'accorded less privacy in . . . automobiles because of th[e] compelling governmental need for regulation,' [citation omitted], does not diminish a motorist's privacy interest in preventing an agent of the government from piercing his skin." *McNeely*, 133 S. Ct. at 1565. In all of the cases relied upon by the State, law enforcement had probable cause or reasonable grounds to believe the driver was operating a vehicle under the influence, and none of the cases stand for the proposition that the implied consent to chemical testing given by drivers on our state's roads under the Kansas implied consent law constitutes consent under the Fourth Amendment.

The State's most persuasive case to support its theory is the recently decided Kansas Supreme Court case of *Johnson*, 297 Kan. 210. In *Johnson*, the defendant was stopped at a sobriety checkpoint, and an officer noticed the defendant's bloodshot and watery eyes and the strong odor of alcohol. The defendant admitted to drinking two beers. As he stepped out of his vehicle, he swayed from side to side, and then he exhibited signs of intoxication during two field sobriety tests. Based on these observations, the officer requested and the defendant consented to a breath test, which he failed. On appeal, the defendant alleged the implied consent laws violate the Fourth Amendment. Our Supreme Court held:

"The search resulting from a test listed in K.S.A. 2007 Supp. 8-1001(a) is the product of the consent exception to the warrant requirement. The State need not make an additional showing of probable cause plus exigent circumstances in order to use the results of a warrantless K.S.A. 2007 Supp. 8-1001(a) test as evidence." 297 Kan. 210, ¶ 8.

Our Supreme Court went on to note: "Although probable cause comes into play in determining whether the law enforcement officer shall request one of the tests listed in K.S.A. 2007 Supp. 8-1001(a), the statute is all about implied consent to the testing." 297 Kan. at 223.

The State fails to acknowledge, however, that *Johnson* was based on K.S.A. 2007 Supp. 8-1001, which stated an officer shall request

a person to submit to a test if the officer has *reasonable grounds* to believe the person was operating a vehicle under the influence of alcohol or drugs. Moreover, unlike in the present case, Johnson personally and specifically *consented* to the breath test, plus the officer had probable cause to believe Johnson was operating a vehicle under the influence based on his observations.

Ultimately, other than the statements from *Johnson* referred to above, the State presents us with no cases which have held consent is valid for Fourth Amendment purposes based on the implied consent statute alone. Without more authority, we are unwilling to take the leap the State asks us to make. And, even if we were so inclined to accept the State's view, it is immaterial because Declerck withdrew her consent. See *United States v. Brown*, No. 13-po-01557, 2013 WL 5604589, at *4 n.1 (D. Md. 2013) (unpublished opinion) ("Assuming arguendo that consent to the blood draw could be derived from the implied consent law, it is clear that the defendant withdrew that consent.").

*3. Does the Good Faith Exception to the Exclusionary Rule Allow for Admission of the Blood Test Results?*

Finally, the State argues if K.S.A. 2011 Supp. 8-1001(b)(2) is found unconstitutional as applied in this case, then the requirements of the good faith exception to the exclusionary rule apply. Relying on *Daniel,* the State argues that law enforcement's good faith reliance on an unconstitutional statute should prohibit application of the exclusionary rule, a judicially created remedy designed to deter law enforcement from infringing on a person's rights, because in this instance law enforcement would not be deterred. See *Daniel,* 291 Kan. at 499-500. Like its argument on consent, the State is raising this issue for the first time on appeal.

We certainly recognize there is a good faith exception to the exclusionary rule when law enforcement reasonably relies on an unconstitutional statute. *Illinois v. Krull,* 480 U.S. 340, 349-50, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987). However, unlike the State's consent argument, resolving this question does not only involve questions of law. A review of the record before the district court reveals the State did not present a clear case of reliance on K.S.A.

2011 Supp. 8-1001 alone to support the blood draw, creating questions of fact. While Trooper Seirer, the lead investigator of the accident and who initially requested the blood draw, testified he relied upon K.S.A. 2011 Supp. 8-1001, he specifically stated his reason for requesting the blood draw was the injury accident. Moreover, on the State's redirect, Seirer testified he also relied upon the fact rolling papers were found in Declerck's vehicle. Although Seirer testified he could have cited Declerck for a number of traffic violations, he did not assert this as a reason he requested the blood draw.

Complicating the analysis is the fact that Seirer did not direct the blood draw himself but requested Topeka police dispatch to send an officer to the hospital where Declerck was located; Yancy ultimately responded. Further complicating the matter is that when Yancy was confronted with Declerck's refusal, he sought guidance from his supervisor, Zimmerman, not from Seirer. Zimmerman never testified, and we do not know the substance of the conversation between Yancy and Zimmerman other than, as a result of the conversation, Yancy proceeded to direct the blood draw.

This chain of events leaves us with factual questions that we cannot resolve on appeal. We are left to question whether Seirer was relying on the elements of K.S.A. 2011 Supp. 8-1001(b)(2) or some form of probable cause as the basis for his requesting the blood draw, and we cannot determine the import of Zimmerman's direction to Yancy because Zimmerman did not testify. Therefore, we decline to address the State's good faith exception argument.

The district court's suppression of the evidence from the blood draw is affirmed.