NOT DESIGNATED FOR PUBLICATION

No. 114,563

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIAM JOSEPH KELLY III,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed April 7, 2017. Affirmed in part, reversed in part, and remanded with directions.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Christopher R. Scott*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

*Per Curiam*:  William Joseph Kelly III was the driver in an accident resulting in the death of his passenger. A jury convicted him of involuntary manslaughter while driving under the influence, and the district court sentenced him to 41 months in prison. Kelly appeals his conviction arguing the district court erred in not suppressing the results of his blood test and in failing to give jury instructions regarding proximate cause and culpable mental state. For the reasons stated herein, we affirm in part, reverse in part, and remand for the district court to determine whether the good-faith exception is applicable as to the admission of the results of the blood test.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On January 6, 2013, Kelly, who was 18 years old at the time, and his friend, Lee King, were drinking at a friend's house. At around 3:30 a.m., the two left, with Kelly driving. On the way home, Kelly approached a sharp turn on a gravel road. Although Kelly applied the brakes and turned the steering wheel, the truck slid on the gravel. The truck hit a row of trees, breaking branches 4 to 5 feet off the ground. The truck fell into a ditch on the passenger side, pinning King underneath. Kelly tried to free King but was unable to do so. King died of mechanical asphyxiation, meaning the truck limited his ability to breath.

After the accident, Kelly submitted to a blood draw. His blood-alcohol level was .11 grams per 100 milliliters of blood. The State charged Kelly with involuntary manslaughter while driving under the influence of alcohol, a severity level 4 person felony.

Kelly filed a motion to suppress the blood draw and test results. He argued that law enforcement failed to obtain a valid consent for the blood test. He contended law enforcement coerced his consent when an officer incorrectly told him he had to submit to a blood test because an accident with a serious injury or death had occurred. He also argued that K.S.A. 2012 Supp. 8-1001, the Kansas implied consent statute applicable in this case, did not provide consent. Finally, he contends there was no probable cause or exigent circumstances justifying the blood draw.

The State filed a response, arguing that K.S.A. 2012 Supp. 8-1001(b)(1)(B) and (b)(2) provided implied consent for the test. The State also argued that probable cause existed for the blood test and that Kelly provided express consent.

The district court held a hearing on the motion. Deputy Brian Davis of the Leavenworth County Sheriff's Office testified at the hearing that Kelly appeared to be impaired at the scene of the accident. Specifically, Davis could smell the faint odor of alcohol on Kelly's breath. He also testified that Kelly told him he had a couple of beers 2 hours before. Davis observed that Kelly had bloodshot eyes and his speech was slightly slurred. He noted the condition of Kelly's speech may have been a combination of the events of the evening and the cold weather. He also admitted Kelly's speech and bloodshot eyes were typical of someone who was upset and had been crying, but he had considered everything as a whole. He did not include any information about Kelly's eyes or speech in his report about the incident.

Sandra Rodgers lived near the scene of the accident. Kelly went to her house for help after the accident. Davis testified he spoke with Rodgers, and she gave no indication that she observed Kelly to be impaired. Davis did not perform any field sobriety tests.

Based on his observations, Davis concluded he needed to further investigate whether Kelly was under the influence of alcohol or drugs. He told Kelly that with the severity of the circumstances, specifically King's death and with the odor of alcohol and impairment, he needed to ask Kelly to go to the nearest hospital to take a blood sample. Davis' report indicated that he told Kelly he was taking him for a blood sample because an accident occurred with a serious injury or death. He admitted at the hearing he did not tell Kelly he had to take a blood sample because he was under the influence.

Davis took Kelly to the hospital and read him the implied consent advisory. Kelly consented to the blood draw. Davis did not arrest Kelly either before or after the blood draw, and he released Kelly to his parents.

The district court denied the motion to suppress. The district court noted the State's reliance on K.S.A. Supp. 2012 8-1001(b), which the district court stated required

3

probable cause to believe a person was operating a vehicle while under the influence of alcohol and was involved in an accident resulting in property damage. In reaching its decision, the court relied on testimony at both the preliminary hearing and the hearing on the motion to suppress. The court pointed out that Kelly admitted he had consumed alcohol and Davis could smell a faint odor of alcohol and observed "some small amount of impairment." The court found this supported Davis' fair belief that "there was some influence or some consumption of alcohol that would've been influencing him in light of the accident scene . . . ."

At the jury trial, Deputy Robert Oliver testified he responded to the scene of Kelly's accident at approximately 5 a.m. When he arrived, the cab of the truck was resting partially on King's head, with the majority of King's body still in the interior of the cab. King was not moving by the time Oliver arrived. King was pronounced dead at the scene.

Oliver spoke with Kelly at the scene. Kelly was visibly shaken and upset about the possible death of his friend. Oliver initially could not smell alcohol on Kelly's breath when the two of them were outside. He also did not observe any indicators of impairment. Once Kelly got into one of the patrol cars on scene, however, Oliver could smell alcohol. Oliver asked Kelly if he had been drinking. Kelly told the officer he had a couple of beers 2 hours before the accident. Oliver also testified that Kelly told him, "I shouldn't drive, but Lee was way, way more drunk."

Oliver testified that the accident occurred at a 90 degree turn on a gravel road with a 35 mph speed limit. There was no sign warning drivers of an upcoming turn, and the area where the accident occurred was not well lit. He stated, however, that if a driver was going 35 mph and had the headlights on, that driver would be able to see the turn as it approached. He also testified there was snow and ice in the area, but there was no ice on the road in the area where the accident occurred.

4

Oliver completed a motor vehicle accident report based on his investigation of the scene. He determined there were several causes of the accident. One was a greater than reasonable speed. He concluded Kelly had been driving at an unreasonable speed because the truck could have completed the turn at a slower speed. Damage to nearby trees indicated the truck had been 4 feet off the ground at one point. Another cause was general inattention. The tire marks in the gravel indicated the vehicle was almost on the left side of the road and accelerating going into the turn. The third reason was overcorrection, which caused the vehicle to roll over as it went off the road. The final reason was impairment due to alcohol.

Oliver told the court that while Kelly was never handcuffed, there was still evidence of a crime. There had been a fatality accident, and Kelly admitted he had been drinking. Additionally, the weather was very cold at the time of the accident, but King had his window rolled down and may have been hanging out of the window. Oliver felt this indicated "tomfoolery." He also noted the height of the broken tree branches indicated Kelly had been driving at an unreasonable speed.

Davis testified he arrived at the scene of the accident at 4:41 a.m. He smelled a faint odor of alcohol on Kelly's breath. He stated Kelly had red eyes and slightly slurred speech. Davis also said the cold may have contributed to his slurred speech. He stated Kelly had no difficulty communicating or walking. Davis testified he explained to Kelly that in the event of an accident with serious injury or death, law enforcement must take a blood sample. Kelly agreed, and Davis made the arrangements to transport him to the hospital to take the sample. Davis later added that "[the blood test] is required under statute; but with him admitting to drinking, along with the odors of alcohol, it's required." At the hospital, Davis gave Kelly the implied consent advisory required prior to blood-alcohol testing and Kelly consented.

A medical professional drew Kelly's blood at 6 a.m. on January 6, 2013. A forensic scientist at the Kansas Bureau of Investigation tested the blood. The results indicated Kelly had a blood-alcohol level of .11 grams per 100 milliliters.

Erik Mitchell, a forensic pathologist and coroner, testified regarding King's cause of death. Mitchell determined that King died as a result of mechanical asphyxia. King was intoxicated at the time of his death, but not to a level that could have caused his death. Mitchell also stated King most likely was not wearing a seatbelt. He testified that King would have had a greater likelihood of surviving if he had worn a seatbelt, but he could not say whether King would have survived if he had been wearing a seatbelt.

Bruce Tomlinson, a private investigator with a law enforcement background and training in accident reconstruction, testified as a defense witness. Based on his investigation, the factors contributing to the accident were: (1) low visibility; (2) lack of signage; and (3) road conditions. He explained that by road conditions he meant the road was gravel with a 90 degree curve and the curve could not be negotiated at 35 mph. He testified that "[i]f you were sober and didn't know about the curve and going 35 miles an hour, the accident would've happened" and that alcohol had not played a role in the accident based on what he had read.

Rodgers testified she had lived near the curve where the accident occurred for 17 years. She testified that the curve was dangerous because a neighbor's driveway made the road look as if it continued past the curve when it did not. There are no posted lights or signs on the curve. She testified there had been at least three other accidents at the curve within 2 or 3 years of Kelly's accident. She stated that even though she had been in close proximity to Kelly after the accident, she did not smell any alcohol. She also did not observe anything that indicated Kelly was under the influence of alcohol.

6

Kelly testified at the trial that he had had 2 to 4 beers at his friends' house on the night of the accident. At around 3 a.m., Kelly and King decided to leave. King was very drunk, and it took a while for the two of them to make it to Kelly's truck. Once King got in, Kelly told him to buckle his seatbelt, but King had already passed out. Kelly tried to put King's seatbelt on but was unable to do so because of the way King was sitting. When Kelly left, he did not know exactly where he was going, so he tried to drive back the way he had come. As he came over a hill, he saw the turn and tried to brake and turn the steering wheel. The truck slid on the gravel, however, and the truck crashed.

Kelly told the court that at the time of the accident he felt he did not have any alcohol in his system and he was capable to drive. He testified he was driving carefully and was going the speed limit. He believed his inability to see the curve and the gravel on the road caused the accident. He felt the ditch by the side of the road exacerbated the severity of the accident. He stated that when he told officers he was going too fast, he meant he was going too fast for the curve. Kelly stated he agreed to the blood draw because the officers at the scene told him he needed to take one because there was an accident with a fatality. He "felt that he had to go take [a blood test]."

Defense counsel requested the district court to instruct the jury on causation by telling the jury that "the road conditions and any other contributing factors are circumstances to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Lee Allen King's death." The district court stated that the pattern instruction on involuntary manslaughter only warranted such an instruction when the victim's conduct contributed to his or her death. Furthermore, the court was only able to find two or three cases where the victim's conduct resulted in his or her death. There was no law to support giving the instruction when road conditions contributed to a death. The court found that there was not enough evidence to find that King's actions substantially contributed to his death and denied the request.

7

Defense counsel also requested the district court instruct the jury on the element of a culpable mental state for the crime of involuntary manslaughter committed while driving under the influence. Defense counsel requested the district court use PIK Crim. 4th 52.300, which instructs the jury that the State must prove the defendant committed the offense intentionally, knowingly, or recklessly. The district court declined to give the instruction, explaining that the legislature eliminated the culpable mental state requirement.

The jury found Kelly guilty of involuntary manslaughter while driving under the influence of alcohol. The court sentenced him to 41 months in prison. Kelly appeals.

MOTION TO SUPPRESS THE BLOOD DRAW

Kelly first argues that the district court erred in not suppressing the results of his blood draw because the draw was an illegal search and seizure. He contends the blood draw was warrantless and no exceptions to the warrant requirement applied. Specifically, he contends Davis did not have probable cause to request the blood draw under Kansas' Implied Consent Law. Furthermore, the implied consent advisory coerced his consent because it inaccurately informed him he faced criminal penalties for test refusal.

Kelly further argues the good-faith exception does not apply in this case. He contends the good-faith exception cannot apply to issues of consent. He argues we lack the necessary facts to determine if the exception applied. He asserts that a reasonable officer should have known the implied consent law was unconstitutional and the Kansas Legislature had abandoned its duty to pass constitutional laws when it enacted the implied consent law.

The State argues that the district court did not err in denying Kelly's motion to suppress because Davis had probable cause to request the blood draw. The State asserts

8

that even if Davis did not have probable cause to request the blood draw, the good-faith exception applies to Davis' use of the DC-70 form. It contends Davis had no way of knowing at the time of the blood draw that the implied consent advisory would later be found unconstitutional.

The standard of review of a district court's decision on a motion to suppress is bifurcated. We review the district court's factual findings to determine whether substantial competent evidence supports them. We review the district court's ultimate legal conclusion using a de novo standard. In reviewing the factual findings, we do not usually reweigh the evidence or assess the credibility of witnesses. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016) (reviewing scope of search warrant); *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014) (determining if emergency aid exception applied to search of apartment); *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014) (motion to suppress inculpatory statements).

In this case, in addition to filing a motion to suppress, defense counsel contemporaneously objected to admission of the results of the blood test at trial. See K.S.A. 60-404 (requiring a contemporaneous objection to the admission of evidence to preserve the issue for appeal). Kelly has properly preserved this issue for appeal.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. The extraction of a blood sample is both a search and a seizure and implicates the constitutional guarantees provided by the Fourth and Fourteenth Amendments. *State v. Murry*, 271 Kan. 223, 226, 21 P.3d 528 (2001) (citing *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 16 L. Ed. 2d 908 [1966]). A warrantless search is per se unreasonable under both the United States and Kansas Constitutions unless a recognized exception applies. *State v. Declerck*, 49 Kan. App. 2d 908, 915, 317 P.3d 794 (2014), *rev. denied* 299 Kan. 1271 (2014). Among these

9

exceptions are consent and probable cause plus exigent circumstances. *State v. Sanchez-Laredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012).

The State has not argued that the probable cause plus exigent circumstances exception applied either before the district court or on appeal. Thus, the State has waived and abandoned any argument that this exception applies. See *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016) (holding an issue not briefed is deemed waived and abandoned). We will now turn to the State's argument that the consent exception to the warrant is applicable under the facts of this case.

Davis invoked the Kansas Implied Consent Law in requesting a blood draw from Kelly. The statute, K.S.A. 2012 Supp. 8-1001, provides in relevant part:

"(a) Any person who operates or attempts to operate a vehicle within this state is deemed to have given consent, subject to the provisions of this article, to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs . . . .

"(b) A law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a): (1) If, at the time of the request, the officer has reasonable grounds to believe the person was operating or attempting to operate a vehicle while under the influence of alcohol or drugs, or both, . . . and one of the following conditions exists: . . . (B) the person has been involved in a vehicle accident or collision resulting in property damage or personal injury other than serious injury; or (2) if the person was operating or attempting to operate a vehicle and such vehicle has been involved in an accident or collision resulting in serious injury or death of any person and the operator could be cited for any traffic offense, as defined in K.S.A. 8-2117, and amendments thereto. The traffic offense violation shall constitute probable cause for purposes of paragraph (2)."

Before administering a test under K.S.A. 2012 Supp. 8-1001(b), law enforcement must provide drivers with an implied consent advisory, which includes informing the

10

driver that "the opportunity to consent to or refuse a test is not a constitutional right" and there are criminal penalties for test refusal. K.S.A. 2012 Supp. 8-1001(k)(2) and (4). This information is generally provided to drivers both orally and in writing by a DC-70 form.

In denying Kelly's motion to suppress, the district court found that the blood draw was permissible under K.S.A. 2012 Supp. 8-1001(b)(1)(B). K.S.A. 2012 Supp. 8-1001(b)(1)(B) requires that officers have reasonable grounds to believe a driver was operating a vehicle under the influence of alcohol before requesting a blood-alcohol test and that the driver was involved in an accident resulting in property damage or injury other than serious injury. "The reasonable grounds test of [K.S.A. 8-1001(b)] is strongly related to the standard for determining probable cause to arrest." *State v. Johnson*, 297 Kan. 210, 222, 301 P.3d 287 (2013). "Probable cause exists when the officer's knowledge of the events creates a reasonable belief that the defendant has committed a specific crime." *State v. Kraemer*, 52 Kan. App. 2d 686, 692, 317 P.3d 954 (2016). In determining whether probable cause exists, courts consider the totality of the circumstances. *Kraemer*, 52 Kan. App. 2d at 692.

Since Kelly's accident, Kansas appellate courts have issued a number of decisions relevant to the district court's legal determination in this case. Approximately 2 years after the hearing on Kelly's motion to dismiss, the Kansas Supreme Court issued its decisions in *State v. Ryce*, 303 Kan. 899, 368 P.3d 342 (2016), and *State v. Nece*, 303 Kan. 888, 367 P.3d 1260 (2016). In *Ryce*, the court held that K.S.A. 2014 Supp. 8-1025, which provides for the separate crime of refusal to submit to any method of blood-alcohol testing, was facially unconstitutional because the statute is not narrowly tailored to serve a compelling state interest. 303 Kan. at 963. The *Nece* court held that informing a driver of criminal penalties for refusing a breath test coerces the driver's consent because the State could not have constitutionally imposed such penalties. Because the driver's consent was based on inaccurate information in the implied consent advisory, the consent was not voluntary. 303 Kan. at 889.

11

After Kelly submitted his original brief, the United States Supreme Court issued its decision in *Birchfield v. North Dakota*, 579 U.S. __, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016). In *Birchfield*, the Court held that the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving but does not permit warrantless blood tests. 136 S. Ct. at 2185. The Court went on to hold that while it was not addressing the constitutionality of various state implied consent laws in general, "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." 136 S. Ct. at 2185-86.

The Kansas Court of Appeals recently applied the holding in *Birchfield* to the Kansas Implied Consent Law in *State v. Schmidt*, 53 Kan. App. 2d 225, 385 P. 3d 936 (2016). In *Schmidt*, a law enforcement officer smelled alcohol coming from Schmidt as he was being transported to the hospital. Suspecting that Schmidt had been driving while intoxicated, the officer gave Schmidt both oral and written implied consent advisories in the form of the DC-70 and requested a blood sample. Schmidt agreed. Based on the holding in *Birchfield*, the court found Schmidt's warrantless blood draw "cannot be upheld based on either search incident to arrest or consent." 53 Kan. App. 2d at 230. The court specifically rejected the claim that a "warrantless blood draw authorized by [K.S.A. 8-1001] falls under the consent exception to the warrant requirement when [law enforcement] advised [the driver] that failure to submit to the test constituted a separate crime." 53 Kan. App. 2d at 230.

Both parties contend that Kelly consented to the blood draw after Davis gave him the implied consent advisory. Therefore, Kelly consented after Davis informed him that a test refusal carried criminal penalties. Based on *Birchfield* and *Schmidt*, such consent is not voluntary. The State does not argue that any other exceptions to the warrant requirement apply in this case. Thus, the warrantless blood draw was an unreasonable search and seizure.

12

*Good-faith exception*

There is a good-faith exception to the exclusionary rule when law enforcement reasonably relies, in objective good faith, on a statute later declared unconstitutional. The application of this exception is a question of law subject to unlimited review. *Illinois v. Krull*, 480 U.S. 340, 349-50, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987); *State v. Daniel*, 291 Kan. 490, 498-500, 242 P.3d 1186 (2010). This court has applied the good-faith exception when a blood draw was taken in reliance on the implied consent provisions of K.S.A. 8-1001(b)(2) and the law enforcement officer fully complied with the statute. *State v. Meitler*, 51 Kan. App. 2d 308, 315-16, 347 P.3d 670, *rev. denied* 302 Kan. 1017 (2015). This court has also applied the good-faith exception when an officer relied on the implied consent advisory to obtain consent for a blood draw. *Schmidt*, 53 Kan. App. 2d 225, Syl. ¶ 2; see also *Kraemer*, 52 Kan. App. 2d at 698-99 (applying good-faith exception to use of implied consent of advisory to obtain breath test).

The State argues for the first time on appeal that the good-faith exception applies to Officer Davis' conduct. Although generally a new legal theory cannot be raised for the first time on appeal, there are three recognized exceptions to this rule: (1) The newly asserted theory involves only questions of law based on proved or admitted facts and is determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or prevent a denial of fundamental rights; and (3) the judgment of the trial court was correct but based on the wrong grounds or reasoning. *State v. Jones*, 302 Kan. 111, 117, 351 P.3d 1228 (2015). If a party seeks to raise a new issue on appeal, Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34) requires the party to explain why this court should consider an issue not raised below for the first time on appeal.

This court has previously addressed the application of the good-faith exception for the first time on appeal. See *Schmidt*, 53 Kan. App. 2d at 231-33. In that case, the court

13

found there were no unresolved issues of fact, and only a question of law determinative of the case remained. 53 Kan. App. 2d at 233. In the present case, however, Kelly argues this court cannot decide this issue because this court does not have the necessary facts. He contends that Davis' testimony at the suppression hearing was unclear as to whether he relied on evidence of impairment or just the fact that an accident occurred that resulted in serious injury or death.

Specifically, Kelly points out that Davis' report indicated he told Kelly he was taking him in for a blood sample because an accident occurred with a serious injury or death and denied that he told Kelly he was taking him in for a blood sample because he was under the influence of alcohol. Based on this evidence, Kelly argues that Davis acted on an incorrect, objectively unreasonable understanding of the requirements of the law and did not even consider or attempt to obtain a warrant for the blood draw. Under such circumstances, Kelly argues that admission of the blood-test results would not serve the purpose of the good-faith exception to the exclusionary rule.

Kelly is correct regarding Davis' testimony. While Davis acknowledged that Kelly was in an accident resulting in serious injury or death, Davis admitted he did not tell Kelly he had to give a blood sample because he was under the influence. Moreover, Davis did not arrest Kelly either before or after the blood draw, and he released Kelly to his parents afterwards. Davis was not entirely clear on whether he was relying on the severity of the accident or probable cause in requesting the blood draw. We conclude that factual questions remain regarding Davis' reasons for requesting the blood draw and whether he reasonably and objectively relied in good faith on the applicable statute in requesting Kelly to submit to a blood test under the totality of the circumstances. See *State v. Pettay*, 299 Kan. 763, 769, 326 P.3d 1039 (2014) (whether good-faith exception applies turns on whether objectively reasonable officer could rely on statute).

Because factual questions remain, Kelly argues we should decide the good-faith exception does not apply without remand. For support of this argument, Kelly relies on *Declerck*, 49 Kan. App. 2d 908. The *Declerck* court declined to apply the good-faith exception because factual questions remained that could not be resolved on appeal. The court did not explain why it chose not to remand the case for further fact findings. 49 Kan. App. 2d at 922-23. The State does not address Kelly's argument that factual questions remain or Kelly's request regarding the disposition of this issue.

Although we are unable to find as a matter of law that the good-faith exception applies in this case, we also are unable to find as a matter of law that the exception does not apply. When factual issues are unresolved, it is the role of the district court to determine, in the first instance, whether the good-faith exception to the exclusionary rule can be applied in a given case. We believe factual issues still remain and we must remand for the district court to determine whether the good-faith exception is applicable as to the admission of the results of the blood test.

JURY INSTRUCTION ON PROXIMATE CAUSE

Next, Kelly argues he was entitled to an instruction that King's conduct and the road conditions were intervening causes in the accident. He asserts this was his theory of defense, and he presented evidence in support of it. He contends the district court's failure to give a proximate cause instruction is reversible error because evidence at trial put causation at issue. The State argues evidence did not support giving the instruction and any error was harmless because there was overwhelming evidence of Kelly's guilt.

The standard of review when addressing challenges to jury instructions is based upon the following analysis:

"'"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2)

15

next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

A defendant has the right to present a defense under both our state and federal constitutions. *State v. Roeder*, 300 Kan. 901, 914, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). When an error infringes upon a party's federal constitutional right, a court will declare a constitutional error harmless only where the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 3d 705 (1967).

Defense counsel requested a proximate cause instruction, thus this issue is properly preserved for review. As he did at trial, Kelly argues on appeal that both King's conduct and the road conditions at the time of the accident were intervening causes which ultimately caused King's death. Because this was his theory of defense, Kelly argues the district court erred in failing to give an instruction on intervening causes. To support his argument, Kelly relies on *State v. Collins*, 36 Kan. App. 2d 367, 138 P.3d 793 (2006).

In *Collins*, a defendant charged with involuntary manslaughter while driving under the influence argued that "the sole cause of the accident was [the victim] sitting on a stationary motorcycle in the middle of the road at night with no warning for a reasonably

16

prudent, nonintoxicated approaching driver." 36 Kan. App. 2d at 372. In support of this argument, an accident reconstruction expert testified at trial that the accident would have occurred even if the defendant had not been intoxicated. The *Collins* court held that an instruction on intervening cause was appropriate. 36 Kan. App. 2d at 372. In reaching its conclusion, the court noted that:

> "'While contributory negligence is no defense in a prosecution for a driving offense of involuntary manslaughter or vehicular homicide, it is a circumstance to be considered along with all other evidence to determine whether the defendant's conduct was or was not the proximate cause of the decedent's death. In some instances, a decedent's contributory negligence may have been a substantial factor in his or her death and a superseding cause thereof; it may have intervened between a defendant's conduct and the fatal result so as to be itself the proximate cause.'" 36 Kan. App. 2d at 371 (quoting *State v. Chastain*, 265 Kan. 16, Syl. ¶ 7, 960 P.2d 756 [1998]).

The *Collins* court also provided a preferred instruction: "'The fault or lack of fault of [the victim] is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of [the victim's] death.'" 36 Kan. App. 2d at 372. PIK Crim. 4th 54.180 now recommends the court give the instruction from *Collins* if causation is at issue in an involuntary manslaughter while driving under the influence case. PIK Crim. 4th 54.180 (2015 Supp.), Comment.

On appeal, Kelly argues that evidence of King's conduct supported a jury instruction on proximate cause. Kelly points out that the coroner testified King was likely not wearing a seatbelt and he would have had a greater likelihood of survival if he had been. Oliver also testified King appeared to have his window rolled down and, given the low temperatures, this indicated he was engaged in some sort of "tomfoolery."

17

However, Kelly testified at trial that King was "passed out" in the passenger seat and sitting on the seatbelt, so Kelly could not get to it. In other words, it was Kelly's decision, not King's, to drive the car with an unseated passenger. Kelly did not argue in his opening or closing statements that King's failure to wear a seatbelt was a contributory factor to his death. Also, we note with significance that in *State v. Brammer*, 301 Kan. 333, 344, 343 P.3d 75 (2015), our Supreme Court noted that the failure of a victim to wear a seatbelt may be irrelevant in an involuntary manslaughter while driving under the influence case, in light of the fact that K.S.A. 8-2504(c) prohibits evidence of the failure of any person to use a safety belt in any action for the purpose of determining any aspect of comparative negligence or mitigation of damages.

Moreover, we find that Oliver's supposition that King may have been engaged in some sort of "tomfoolery," which was directly disputed by Kelly's own testimony, was much too speculative to support the giving of a proximate cause instruction to the jury. Thus, we conclude the district court did not err in denying Kelly's request for a proximate cause instruction based on King's conduct.

As for a proximate cause instruction based on road conditions, Kelly relies on *Collins* to support his argument. The *Collins* court held that an intervening cause instruction was appropriate where the victim's conduct may have been the sole cause of the accident and evidence demonstrated even a sober driver could not have avoided the accident. 36 Kan. App. 2d at 372. Kelly contends his case is factually similar because the sole causes of the accident were the conditions of the road and the lack of visibility and signage, which provided no warning for a reasonably prudent, approaching driver.

Nevertheless, there do not appear to be any involuntary manslaughter cases addressing whether road conditions may be an intervening cause. Furthermore, our research did not uncover any negligence cases addressing whether road conditions may be an intervening cause in a car accident. Negligence cases do, however, provide

18

guidance on what constitutes an intervening cause. The Kansas Supreme Court has explained intervening causes in the context of negligence as follows:

> "An intervening cause is 'one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.' Restatement (Second) of Torts 441 (1964). An intervening cause absolves a defendant of liability only if it supersedes the defendant's negligence. In other words, the superseding and intervening cause 'component breaks the connection between the initial negligent act and the harm caused.' *Hale*, 287 Kan. at 324. But, one more factor—foreseeability—must be considered. 'If the intervening cause is foreseen or might reasonably have been foreseen by the first actor, his negligence may be considered the proximate cause, notwithstanding the intervening cause. [Citation omitted.]' *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 51, 815 P.2d 506 (1991)." *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 421, 228 P.3d 1048 (2010).

See also PIK Civ. 3d 104.03 (2005) ("If, however, the intervening cause was foreseen or should reasonably have been foreseen by the person responsible for the first cause, then such person's conduct would be the cause of the injury, notwithstanding the intervening cause, and *(he)(she)* would be at fault."); *cf.* PIK Civ. 4th 104.03 (2010 Supp.) (superceding cause). The Kansas Supreme Court has applied a similar analysis in the criminal context. See, *e.g.*, *State v. Anderson*, 270 Kan. 68, 74-77, 12 P.3d 883 (2000).

Based on this explanation, an intervening cause will not rise to a superseding cause if it was foreseeable. Kelly did not argue at trial that the road conditions which contributed to the accident were not foreseeable. The evidence, viewed in the light most favorable to Kelly, also does not support this argument. Kelly knew there was low visibility and gravel on the road. Kelly testified that he had driven on the same road 6 months earlier and stated:

> "I didn't know exactly where I was going 'cause that was the first time I've been down that road in a while. But I knew where I came from, so I went—I tried to go back the

same way that I went. And we got onto the road, and beings how coming from one way is different from going the other (indicating), *I didn't remember where exactly the corners were*. There was no signs. I just couldn't tell that there was a sign—there was a turn there." (Emphasis added.)

Oliver also testified there was another 90 degree turn previously on the road Kelly was driving on. Thus, Kelly already knew there were sharp curves in the road. Based on the evidence presented in the case, and in light of the fact that there are no involuntary manslaughter cases addressing whether road conditions may be an intervening cause, we conclude the district court did not err in denying Kelly's request for a proximate cause instruction based on road conditions.

CULPABLE MENTAL STATE INSTRUCTION

Kelly next argues that despite the failure of the statute on involuntary manslaughter while driving under the influence to specify a culpable mental state, one is still required. Thus, he contends he was entitled to an instruction on intent. He asserts failure to give the instruction was reversible error because intent was at issue in his case.

The State argues the plain language of the statute and prior case law demonstrate involuntary manslaughter while driving under the influence is a strict liability offense. Because it is a strict liability offense, Kelly was not entitled to an instruction on intent. Even if the district court erred in failing to give the instruction, the State asserts any error was harmless because there was overwhelming evidence of Kelly's guilt.

As previously noted, the standard of review for challenges to jury instructions requires this court to determine the reviewability of the issue, whether the instruction is legally and factually appropriate, and whether failure to give the instruction was harmless error. *Fisher*, 304 Kan. at 256-57. To the extent this issue requires statutory

20

interpretation, this court's review is unlimited. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 622 (2013).

Defense counsel requested an instruction on culpable mental state. Specifically, defense counsel requested the district court use PIK Crim. 4th 52.300, which instructs the jury that the State must prove the defendant committed the offense intentionally, knowingly, or recklessly, but the district court declined to give the instruction. Thus, defense counsel properly preserved this issue for review.

K.S.A. 2012 Supp. 21-5202 covers the mental culpability required for crimes. It provides, in relevant part:

> "(a) Except as otherwise provided, a culpable mental state is an essential element of every crime defined by this code. A culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'
>
> . . . .
>
> "(d) If the definition of a crime does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element.
>
> "(e) If the definition of a crime does not prescribe a culpable mental state, but one is nevertheless required under subsection (d), 'intent,' 'knowledge' or 'recklessness' suffices to establish criminal responsibility."

K.S.A. 2012 Supp. 21-5203 lists a number of crimes which do not require a culpable mental state. One of these crimes is driving under the influence pursuant to K.S.A. 8-1567. K.S.A. 2012 Supp. 21-5203(c). The statute also exempts felonies when "the statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described." K.S.A. 2012 Supp. 21-5203(b).

21

K.S.A. 2012 Supp. 21-5405 defines the crime of involuntary manslaughter. It provides "[i]nvoluntary manslaughter is the killing of a human being committed: (1) Recklessly; . . . [or] (3) in the commission of, or attempt to commit, or flight from an act described in K.S.A. 8-1567, and amendments thereto." K.S.A. 2012 Supp. 21-5405(a).

In *State v. Creamer*, 26 Kan. App. 2d 914, 996 P.2d 339 (2000), a panel of this court determined that involuntary manslaughter while driving under the influence was an absolute liability offense. 26 Kan. App. 2d at 918. At the time, K.S.A. 1998 Supp. 21-3442 defined the crime as: "the unintentional killing of a human being committed in the commission of, or attempt to commit, or flight from an act described in K.S.A. 8-1567 and amendments thereto." 26 Kan. App. 2d at 916-17. In reaching its conclusion, the court noted that it had long held that driving while under the influence of alcohol or drugs was an absolute liability offense. 26 Kan. App. 2d at 917. The court went on to note:

> "'[T]he legislature is presumed to act with knowledge of relevant judicial decisions.' *Junction City Education Ass'n v. U.S.D. No. 475*, 264 Kan. 212, 220, 955 P.2d 1266 (1998). Accordingly, we conclude that when the legislature enacted K.S.A. 21-3441 and K.S.A.1998 Supp. 21-3442, it made the commission of the underlying DUI the act required for criminal liability with full knowledge that the courts of this state had determined DUI to be a strict liability offense." 26 Kan. App. 2d at 918.

Since *Creamer*, the legislature has amended the involuntary manslaughter while driving under the influence statute to read: "Involuntary manslaughter is the killing of a human being committed . . . in the commission of, or attempt to commit, or flight from an act described in K.S.A. 8-1567, and amendments thereto." K.S.A. 2012 Supp. 21-5405(a)(3). The legislature also specifically listed driving while intoxicated, K.S.A. 8-1567, as a crime which required no culpable mental state. K.S.A. 2012 Supp. 21-5203(c).

22

The plain language of the relevant statutes suggests involuntary manslaughter while driving under the influence is a strict liability offense. The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). While involuntary manslaughter while driving under the influence is not specifically listed as a crime without mental culpability under K.S.A. 2012 Supp. 21-5203, the statute provides that for felonies, a person may be found guilty without criminal intent when the statute defining the felony offense "clearly indicates a legislative purpose to impose absolute liability for the conduct described." K.S.A. 2012 Supp. 21-5203(b). By predicating liability for involuntary manslaughter while driving under the influence on the commission of a strict liability offense, the legislature indicated a purpose to impose liability.

Furthermore, the Kansas Legislature's failure to change the statute to add a culpable mental state also indicates it is a strict liability crime. Courts generally presume that the legislature acts with full knowledge about the statutory subject matter, including prior and existing law, and judicial decisions interpreting the same. *State v. Kershaw*, 302 Kan. 772, 782, 359 P.3d 52 (2015). When the legislature fails to modify a statute to avoid a standing judicial construction of the statute, we presume the legislature intended the statute to be interpreted as the courts have done. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1052, 190 P.3d 245 (2008). In this case, this court must presume that the legislature was aware of the holding in *Creamer* but took no action to alter it by adding a culpable mental state requirement for K.S.A. 2012 Supp. 21-5405(a)(3).

Kelly argues *Creamer* is not controlling because the legislature has since removed the word "unintentional" from the involuntary manslaughter statute. The *Creamer* court's decision does not appear to be based on the use of the word unintentional, however.

23

Rather, the court determined that the underlying crime of DUI was the act that provided criminal liability and the legislature enacted the statute knowing DUI was a strict liability offense. 26 Kan. App. 2d at 918-19. Here, the legislature specifically codified driving under the influence as a strict liability crime, but did not alter the language in K.S.A. 2012 Supp. 21-5405(a)(3) to indicate a required culpable mental state.

Kelly further argues that *Creamer* was decided before the enactment of K.S.A. 2012 Supp. 21-5202, which states that a culpable mental state is an essential element of every crime except as otherwise provided. K.S.A. 2012 Supp. 21-5202(a). In *Creamer*, though, the defendant argued that the statute defining involuntary manslaughter while driving under the influence conflicted with K.S.A. 21-3201 (the predecessor to K.S.A. 2012 Supp. 21-5202, which stated "Except as otherwise provided, a criminal intent is an essential element of every crime defined by this code." 26 Kan. App. 2d at 916. The court rejected this argument, finding that the statue in question fell within the "except as otherwise provided" language. 26 Kan. App. 2d at 919-20. Similarly, K.S.A. 2012 Supp. 21-5405(a)(3) falls under the "except as otherwise provided" language.

Kelly also argues that the decision in *State v. Heironimus*, 51 Kan. App. 2d 841, 356 P.3d 427 (2015), is more pertinent to the present issue. The *Heironimus* court addressed whether the crime of leaving the scene of an accident required a culpable mental state. The statute governing the offense, K.S.A. 2011 Supp. 8-1602(a) did not specify a culpable mental state. See 51 Kan. App. 2d at 845. The State argued that the offense imposed absolute liability, but the *Heironimus* court rejected this argument based on the plain language of K.S.A. 2011 Supp. 21-5203 and 21-5202(d) and an analysis of prior case law regarding the offense. 51 Kan. App. 2d at 849-50. The court ultimately concluded "because a culpable mental state is required unless the definition of an offense plainly dispenses with that requirement or clearly indicates a legislative purpose to impose absolute liability and K.S.A. 2011 Supp. 8-1602 lacks both these indicators, it is clear that criminal intent must be an element of that offense." 51 Kan. App. 2d at 850.

24

Kelly's case is distinguishable. For one, unlike the statute at issue in *Heironimus*, prior case law regarding involuntary manslaughter while driving under the influence is very clear regarding the offense's culpable mental state. See *Heironimus*, 51 Kan. App. 2d at 847-49 (discussing disparities in prior case law regarding leaving the scene of a crime and other traffic-related offenses); *Creamer*, 26 Kan. App. 2d at 918. Additionally, criminal liability for leaving the scene of an accident is not based on the commission of an absolute liability offense. Lastly, the current codification of involuntary manslaughter while driving under the influence does indicate a legislative intent to impose absolute liability. For all these reasons, we conclude the district court did not err in denying Kelly's request for a jury instruction on the culpable mental state to commit the crime of involuntary manslaughter while driving under the influence.

CONCLUSION

We conclude that the district court did not err in failing to give jury instructions regarding proximate cause and culpable mental state. However, we reverse and remand for the district court to determine whether the good-faith exception is applicable as to the admission of the results of the blood test. If the district court finds that the good-faith exception applies, then Kelly's conviction of involuntary manslaughter while driving under the influence is upheld. If the district court finds that the good-faith exception does not apply, then the district court is directed to set aside Kelly's conviction and grant his motion to suppress the results of the blood test.

Affirmed in part, reversed in part, and remanded with directions.