NOT DESIGNATED FOR PUBLICATION

No. 115,985

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

HAILEY ANN LARKIN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Jackson District Court; NORBERT C. MAREK, JR., judge. Opinion filed December 15, 2017. Affirmed.

*Matthew R. Williams*, of Rork Law Office, of Topeka, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, *Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., ATCHESON, J., and WALKER, S.J.

PER CURIAM: Hailey Ann Larkin appeals her conviction for driving under the influence (DUI) of alcohol. She contends that the district court erred by (1) sua sponte raising the good-faith exception to deny her motion to suppress the blood test result based on the Kansas Supreme Court decision in *State v. Nece*, 303 Kan. 888, 367 P.3d 1260 (2016), *aff'd on reh'g* 306 Kan. 679, 396 P.3d 709 (2017); (2) denying her motion for a directed verdict alleging that the State did not prove what her blood-alcohol concentration was *at the time of driving*; and (3) making several comments throughout the proceedings that she alleges constituted judicial misconduct. Larkin also challenges her sentence

1

because the State did not present evidence to support the existence of her prior DUI convictions. Finding no errors requiring reversal, we affirm.

FACTS

On July 25, 2015, shortly after 2:30 a.m., Jackson County Deputy Mark Wohlin observed Larkin speeding and conducted a traffic stop. He noticed Larkin's back-up lights come on while her vehicle was rolling to a stop and then the vehicle jerked violently, making a sudden stop. The deputy believed Larkin had difficulty putting the vehicle into park. When he approached Larkin, he smelled a strong odor of alcohol coming from her and noticed her eyes were glassy. When she opened her mouth to speak, the smell became stronger. Deputy Wohlin asked Larkin how much alcohol she had consumed. Larkin stated that she had had five beers. She said she started drinking after 9:30 p.m., and the deputy believed she said she stopped at 11:30 p.m.

The deputy began a DUI investigation. Larkin failed two nonstandard sobriety tests—the finger dexterity test and the counting backwards test. She also failed two standard field sobriety tests—the walk-and-turn test and the one-leg stand test. Deputy Wohlin arrested Larkin for driving under the influence of alcohol and took her to jail. After arriving, the deputy read Larkin the DC-70 waiver form. Larkin agreed to a blood test. A sample of Larkin's blood was taken at 3:54 a.m. Testing showed her blood-alcohol level was .174.

The State charged Larkin with DUI under K.S.A. 2015 Supp. 8-1567(a)(1) and (b)(1)(D), a nonperson felony, and speeding, a traffic infraction. On February 16, 2016, Larkin filed a motion to suppress the blood draw and other evidence. Ten days later, on February 26, 2016, the Kansas Supreme Court decided *State v. Ryce*, 303 Kan. 899, 368 P.3d 342 (2016), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017), and *Nece*. Larkin

filed a supplemental memorandum of law in support of her motion to suppress citing *Ryce* and *Nece*.

The district court heard Larkin's motion to suppress on March 4, 2016. Larkin argued *Ryce* and *Nece* invalidated her consent to the evidentiary blood test, and the test result should be suppressed. The court sua sponte raised the good-faith exception to the exclusionary rule and denied Larkin's motion. Larkin filed a motion to reconsider, arguing that the court was not permitted to raise the good-faith exception sua sponte. The court denied the motion. The court cited Chief Judge Malone's concurrence in *State v. Nece*, No. 111,401, 2014 WL 5313744 at *9 (Kan. App. 2014) (unpublished opinion) (Malone, C.J., concurring), finding that the good-faith exception presents a "pure legal question." The court also cited the "rapidly approaching trial" and the State lacking time to respond on short notice.

A one-day jury trial was held on March 18, 2016. The district court granted Larkin a standing objection on the issues raised in her motion to suppress. After the State rested, Larkin made a motion for a directed verdict, arguing that the State did not present evidence showing what Larkin's blood-alcohol level was *at the time of driving*. Larkin argued the State failed to present testimony about the rate of absorption or decay of alcohol once it is in the bloodstream or how alcohol is metabolized. The court denied the motion.

The jury found Larkin guilty on both charges. The district court set a posttrial motion deadline of April 29, 2016. Larkin filed a motion to reconsider directed verdict on that date. The court took up the motion prior to sentencing. Larkin argued that the results of a blood-alcohol sample taken *within three hours* of her operation of a vehicle were not competent evidence to prove a violation of K.S.A. 8-1567(a)(1), the charged crime, because the Legislature specifically provided that such a sample was proof of a violation under a more specific section, K.S.A. 8-1567(a)(2). The district court denied the motion.

3

The court found the phrase "'any competent evidence'" in subsection (a)(1) to be "clear as a bell." Subsection (a)(1) was meant to "cover the waterfront" and include any type of admissible evidence.

A presentence investigation (PSI) report was completed. Larkin did not object to the PSI report at sentencing. The PSI report listed two prior DUI convictions. The court sentenced Larkin to felony DUI. Larkin timely appeals.

ANALYSIS

*The district court's use of the good-faith exception*

Larkin first challenges the district court's decision to invoke the good-faith exception because the decision was not supported by evidence and the State itself did not raise the good-faith exception.

At the motion hearing, Larkin argued *Ryce* and *Nece* invalidated her consent to the evidentiary blood test. In *Ryce*, the Kansas Supreme Court held that K.S.A. 2014 Supp. 8-1025, which made it a crime to refuse to submit to a blood, breath, or urine test for alcohol content, was unconstitutional. 303 Kan. 899, Syl. ¶¶ 1, 5, 9, 12. In *Nece*, the court held that consent to breath-alcohol testing "is not freely and voluntarily given if such consent was given following a written and oral advisory informing the suspect that he or she might 'be charged with a separate crime of refusing to submit to a test to determine the presence of alcohol'" because the advisory was inaccurate in light of *Ryce*. *Nece*, 303 Kan. 888, Syl. Nece had received the implied consent advisory, commonly referred to as the DC-70 form, which contained language warning of the criminal refusal statute invalidated by the *Ryce* court. The court affirmed the district court's decision to suppress Nece's breath-alcohol test result because the testing resulted from involuntary consent. *Nece*, 303 Kan. at 897.

4

In our case, the prosecuting attorney merely said she had skimmed the *Ryce* and *Nece* decisions and asked the district court to carefully consider Larkin's argument because it would result in the court kicking out every breath or blood test that had been done in the last several years.

After the United States Supreme Court decision in *Birchfield v. North Dakota*, 579 U.S. ___, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016), the Kansas Supreme Court issued opinions on rehearing in *Ryce* and *Nece* on June 30, 2017. The court reaffirmed its ultimate holdings. *Ryce*, 306 Kan. at 683; *Nece*, 306 Kan. at 681.

The standard of review of a district court's decision on a motion to suppress is bifurcated. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion is reviewed using a de novo standard. In reviewing the factual findings, the appellate court does not reweigh the evidence or assess the credibility of witnesses. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). The State carries the burden to prove that a search and seizure was lawful. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

Larkin first contends that the district court's decision denying her motion to suppress evidence on the basis of the good-faith exception was not supported by substantial evidence because it was not supported by *any* evidence. She complains that no evidence was heard at the motion hearing and that the basis or belief for Deputy Wohlin's actions was not discussed at the preliminary hearing.

While no evidence was taken at the motion hearing, the district court relied on the evidence presented at the preliminary hearing. The preliminary hearing had been held before a different judge than the judge who heard the motion to suppress. But the judge stated he had read the preliminary hearing transcript "toe to toe" and he thought he had

5

actually read it more than once. The judge stated that he believed both parties would agree that the deputy read the DC-70 form to Larkin as it existed at the time. Neither side disputed this statement. Larkin's attorney agreed that was reflected in the preliminary hearing transcript. At the preliminary hearing, Deputy Wohlin stated that he had given the implied consent warnings in the DC-70 form. He testified that, as part of the warning, he informed Larkin that refusal could result in a criminal penalty. After going over the implied consent warning, Larkin agreed to a blood draw. The deputy agreed that he did not have a warrant for the blood draw. The court found that the good-faith exception applied and denied Larkin's suppression motion.

Our Supreme Court has recognized a good-faith exception to the exclusionary rule when an officer acted in objectively reasonable reliance on a statute that is later determined to be unconstitutional. The good-faith exception is dependent on whether a statute can support an officer's objective reasonable reliance on it, not on the officer's subjective beliefs. An officer's reliance on a statute is not objectively reasonable if: "(a) in its enactment, the legislature wholly abandoned its responsibility to pass constitutional laws; or (b) the statutory provisions are such that a reasonable law enforcement officer should have known the statute was unconstitutional." *State v. Daniel*, 291 Kan. 490, Syl. ¶ 8, 242 P.3d 1186 (2010). Whether suppression of evidence resulting from an unlawful search is the appropriate remedy is a question of law. 291 Kan. at 493-500.

Our Supreme Court has previously applied the good-faith exception over a defendant's argument that the district court lacked facts because the officer did not testify that he or she relied on the statute later held unconstitutional to conduct the search. In *State v. Dennis*, 297 Kan. 229, 300 P.3d 81 (2013), the defendant moved to suppress evidence found in his vehicle during a search conducted incident to his arrest. The search occurred prior to the court declaring unconstitutional K.S.A. 22-2501(c), which governed the permissible circumstances, purposes, and scope of a search incident to arrest. A divided Court of Appeals panel refused to apply the good-faith exception in part because

6

the officer did not testify that he relied on K.S.A. 22-2501(c) to conduct the search. The Kansas Supreme Court reversed, holding that "it was unnecessary for the officer to specifically articulate K.S.A. 22-2501 as authority for the search because application of a good-faith exception to the exclusionary rule is not governed by a subjective inquiry. The question is whether an objectively reasonable officer could rely on K.S.A. 22-2501." 297 Kan. at 230. The officer testified that the search of the defendant's vehicle was a "search incident to arrest," which necessarily carried with it the understanding that the authority for the search came from K.S.A. 22-2501. 297 Kan. at 237. The officer was not required to cite the statute on the witness stand.

Panels of this court have held that the application of the good-faith exception is a pure question of law when the appellant pointed to no disputed facts. In a case very similar to ours, *State v. Schmidt*, 53 Kan. App. 2d 225, 231-33, 385 P.3d 936 (2016), *rev. denied* 306 Kan. __ (October 27, 2017), Schmidt was arrested for DUI. The arresting officer requested that Schmidt submit to a blood test and informed him that failure to submit constituted a separate crime. Schmidt acquiesced to the test. This court allowed the State to invoke the good-faith exception for the first time on appeal because Schmidt pointed to no disputed facts and the question of whether the good-faith exception rule should apply to warrantless blood tests as authorized by the implied consent law involved only a question of law. See *State v. Steckline*, No. 112,242, 2017 WL 383343 (Kan. App. 2017) (unpublished opinion), *rev. denied* 306 Kan. __ (October 27, 2017).

But, factual questions may remain when an officer's testimony makes it unclear which of two legal bases he or she relied on to conduct a search. In *State v. Kelly*, No. 114,563, 2017 WL 1295354, at *1 (Kan. App. 2017) (unpublished opinion), *rev. denied* 306 Kan. __ (October 27, 2017), Kelly was the driver in a traffic accident resulting in the death of his passenger. An officer asked Kelly to take a blood sample. The officer read Kelly the implied consent advisory. Kelly consented to a blood draw. The panel held Kelly's consent was involuntary. The State argued for the first time on appeal that the

good-faith exception applied. Kelly argued that there were insufficient facts to decide the issue because the officer's testimony was unclear as to whether, when requesting the blood sample, the officer relied on evidence that Kelly was under the influence of alcohol or just the fact that an accident occurred resulting in a death. Kelly argued the latter, that the officer acted on an incorrect and objectively unreasonable understanding of the law. The panel agreed that factual questions remained regarding the officer's reasons for requesting the blood draw. 2017 WL 1295354, at *1-8.

Here, neither party has ever argued that Deputy Wohlin relied on anything other than Larkin's consent after reading her the DC-70 form. This is not a case involving a fatal accident. Larkin does not cite any disputed facts that prevent this court from deciding the issue. In accord with *Dennis*, the deputy did not need to specifically invoke the statute as authority for the blood draw.

Larkin further contends that the district court was not permitted, as a matter of law, to raise the good-faith exception when it was not raised or argued by the State. Larkin cites several cases that give the basic rule that it is error for a district court to raise, sua sponte, nonjurisdictional issues. See, e.g., *Frontier Ditch Co. v. Chief Engineer of Div. of Water Resources*, 237 Kan. 857, 864, 704 P.2d 12 (1985); *Huffmier v. Hamilton*, 30 Kan. App. 2d 1163, 1166, 57 P.3d 819 (2002). Under this rule, the district court clearly erred.

The State does not dispute this rule, but it argues that it may raise the good-faith exception for the first time on appeal because it is an issue of law and the district court may be upheld if it was right for any reason.

There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally

8

determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the district court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

The *Nece* court said this regarding the good-faith exception:

"Chief Judge Malone, in his separate Court of Appeals' opinion, also concluded the advisory was unconstitutionally coercive—although on different grounds. But he then applied the good-faith exception to permit the use of any evidence obtained through the search, as at the time the police had no reason to think [K.S.A.] 8-1025 was unconstitutional or that the [K.S.A.] 8-1001 advisory was inaccurate. Despite Chief Judge Malone's suggestion that the good-faith exception might apply, the State did not file a supplemental brief presenting the argument to us and at oral argument the attorney for the State conceded that the State was not seeking application of the exception. We, therefore, decline to consider the potential application of the exception to Nece's case. *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (an argument not briefed is deemed waived and abandoned)." 303 Kan. at 897.

Here, unlike in *Nece*, the State now, on appeal, does argue that the good-faith exception should be applied to this case.

In support of her argument that the good-faith exception should not apply, Larkin cites *State v. Declerck*, 49 Kan. App. 2d 908, 922-23, 317 P.3d 794 (2014). In *Declerck*, following a single-vehicle fatality accident, an officer directed medical personnel to withdraw blood without a warrant from the driver of the vehicle, despite the driver's refusal. The district court granted Declerck's motion to suppress the blood test result. This court affirmed because the warrantless blood draw was not done with probable cause and because Declerck's implied consent under Kansas statute did not constitute consent for

9

purposes of a valid exception to the warrant requirement under the Fourth Amendment to the United States Constitution. 49 Kan. App. 2d at 909-10. For the first time on appeal, the State argued the good-faith exception should be applied. This court declined to address the good-faith exception argument because the State did not establish an adequate record and there were disputed facts that prevented the court from addressing the issue. 49 Kan. App. 2d at 910. The court was unable to determine whether the officers were relying on K.S.A. 2011 Supp. 8-1001(b)(2) or some form of probable cause as the basis for the requested blood draw. 49 Kan. App. 2d at 923.

We find *Declerck* to be readily distinguishable from this case. Here, as stated above, there are no disputed facts preventing this court from addressing the applicability of the good-faith exception.

Larkin also cites *State v. Hicks*, 282 Kan. 599, 600, 618, 147 P.3d 1076 (2006), in which the Kansas Supreme Court affirmed the district court's suppression of evidence because the affidavit supporting the search warrant was insufficient. Regarding the good-faith exception, the court stated:

> "Had the State pursued an argument regarding application of the [*United States v.*] *Leon*, 468 U.S. 897, [104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984),] good faith exception to the exclusionary rule, we would have entertained it on the merits. However, to his credit as a professional, the prosecutor acknowledged at oral argument before us that he had not argued *Leon*'s applicability to save this search. Indeed, he was reluctant to address its potential applicability, even when asked to do so directly. Under these circumstances, we regard the *Leon* argument as waived." 282 Kan. at 617-18.

*Hicks* is unhelpful to Larkin's position because our Supreme Court stated that it would have entertained a good-faith exception argument had the State raised it on appeal. But since the State in our case has argued the good-faith exception on appeal, there is no obstacle to our consideration of it. However, we note that the parties have only argued,

10

respectively, that the good-faith exception should or should not be considered by us at all. Neither side has briefed the merits of whether the exception should apply if we did reach the issue, as we have now elected to do. The closest thing to argument of the merits is the State's brief contention that the exclusionary rule would have no deterrent effect because any objective officer would have followed the law in effect.

Several panels of this court have fully considered the merits and found the good-faith exception applicable under similar facts. See *Schmidt*, 53 Kan. App. 2d at 233-37; *State v. Kraemer*, 52 Kan. App. 2d 686, 698, 371 P.3d 954 (2016), *rev. denied* 306 Kan. __ (October 27, 2017); *State v. McClellan*, No. 115,164, 2017 WL 839720, at *10-14 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* March 31, 2017; *Steckline*, 2017 WL 383343, at *5-8; *State v. Rincon*, No. 113,741, 2016 WL 3856670, at *3-5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. __ (October 27, 2017).

We are persuaded by the holdings in these prior cases and find that the good-faith exception should apply in this case.

*Denial of the motion for directed verdict of acquittal*

Larkin next contends the State did not prove what her blood-alcohol content was *at the time she was operating her vehicle*, as required by K.S.A. 8-1567(a)(1), the charged crime.

In reviewing a district court's decision to deny a defendant's motion for a judgment of acquittal, an appellate court will consider all the evidence in the light most favorable to the State and determine if a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In doing so, the appellate court will not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Llamas*, 298 Kan. 246, 254, 311 P.3d 399 (2013).

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). When construing statutes to determine legislative intent, appellate courts must consider various provisions of an act in pari materia with a view of reconciling and bringing the provisions into workable harmony if possible. *State v. Keel*, 302 Kan. 560, Syl. ¶ 7, 357 P.3d 251 (2015).

K.S.A. 2015 Supp. 8-1567(a) read, in relevant part:

"(a) Driving under the influence is operating or attempting to operate any vehicle within this state while:

(1) The alcohol concentration in the person's blood or breath as shown by any competent evidence, including other competent evidence, as defined in paragraph (1) of subsection (f) of K.S.A. 8-1013, and amendments thereto, is .08 or more;

(2) the alcohol concentration in the person's blood or breath, as measured within three hours of the time of operating or attempting to operate a vehicle, is .08 or more;

(3) under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle."

K.S.A. 2015 Supp. 8-1013(f)(1) reads: "(f) 'Other competent evidence' includes: (1) Alcohol concentration tests obtained from samples taken three hours or more after the operation or attempted operation of a vehicle."

12

K.S.A. 8-1005 addresses evidence that may be used in a criminal DUI prosecution generally and states "evidence of the concentration of alcohol or drugs in the defendant's blood, urine, breath or other bodily substance may be admitted." K.S.A. 8-1006 states that the provisions of K.S.A. 8-1005 do not limit the introduction of any other competent evidence bearing upon the question of whether the defendant was DUI. We note the broad inclusivity of these statutes and further observe that their provisions do not refer to any time limitations governing use of the evidence or restrict the admissibility of such evidence to any particular subsection of the DUI law.

Larkin argues that subsections (a)(1) and (a)(2) of K.S.A. 2015 Supp. 8-1567 are mutually exclusive. She contends that each subsection has a specified timeframe that the blood draw must take place:  (a)(1) over three hours or (a)(2) within three hours. Under this interpretation, if the driver's blood was drawn within three hours of the driver's operation or attempted operation of a vehicle, the driver's blood-alcohol content cannot be used as evidence to convict him or her under (a)(1).

Here, Larkin's blood was drawn within three hours of her operation of her vehicle. The State presented evidence that Larkin was stopped shortly after 2:30 a.m. and her blood was drawn at 3:54 a.m. Larkin could have been charged under (a)(2) and this problem would have been avoided. The State readily admits this.

The State argues that the difference between subsections (a)(1) and (a)(2) is that (a)(2) is a per se rule while (a)(1) is not. Under (a)(2), if a driver has a blood-alcohol content of .08 or higher within three hours of operating a vehicle, that driver was driving under the influence. However, (a)(1) requires proof that the driver's blood-alcohol content was .08 or higher *at the time* the person was operating the vehicle. Because the blood-alcohol test can never be obtained at the precise time of driving, other evidence must be used to prove the driver's blood-alcohol content at the time of driving. And, the State

13

argues, a blood draw performed within three hours of driving may be used as "any competent evidence" to prove a violation of (a)(1).

K.S.A. 2015 Supp. 8-1567(a)(1), (a)(2), and (a)(3) each provide a different basis for conviction and each has requirements that must be met. See *State v. Pendleton*, 18 Kan. App. 2d 179, 849 P.2d 143 (1993). The *Pendleton* court cited legislative history discussing the addition of (a)(1) in 1990:

> "Research of legislative history behind the 1990 amendments reveals that James Keller of the Kansas Department of Revenue testified before the House Committee on Transportation on February 6, 1990, in support of HB 2658, a bill which included amendments, subsequently approved, to K.S.A. 1989 Supp. 8-1567. In a memorandum to the committee dated February 7, 1990, Keller outlined the Department of Revenue's recommendations as contained in HB 2658, including:
>
>> 'K.S.A. 8-1567 is amended to allow evidence other than a breath or blood test taken within two hours to support a conviction for operating or attempting to operate a vehicle with an alcohol concentration of .10 or more. Other competent evidence (including expert testimony) could be used to arrive at a determination that the person operated or attempted to operate with an alcohol concentration of .10 or more. The present provision allowing prosecution based only upon a breath or blood test taken within 2 hours is also retained. Some district courts have refused to allow evidence other than a test taken within the two-hour period in a prosecution under the present "per se" statute. The change would simply allow other evidence to be used to prove a person had an alcohol concentration of .10 or more at the time of operation or attempted operation.'" 18 Kan. App. 2d at 184-85.

We believe the State's interpretation of the statute is correct. Larkin's interpretation of the statute would render meaningless the phrase "any competent evidence" in subsection (a)(1). Larkin focuses only on the meaning of "other competent evidence." But the statute reads "any competent evidence, including other competent evidence." The

14

phrase "any competent evidence" is not ambiguous. "Any competent evidence" is necessarily broader than "other competent evidence" because it includes "other competent evidence." Thus we need not speculate about the legislative intent beyond the clear language.

However, while Larkin's blood draw was competent evidence under (a)(1), the question remains whether it was *sufficient* evidence to show what Larkin's blood-alcohol content was at the time of driving.

Larkin complains that the State did not present evidence of how alcohol metabolizes in the blood to show what Larkin's blood-alcohol content was at the appropriate time.

In *State v. Sliva*, 25 Kan. App. 2d 437, 437-40, 962 P.2d 1146 (1998), a divided Court of Appeals panel held there was sufficient evidence to support a conviction under (a)(1), despite the absence of expert testimony on alcohol metabolism. The evidence at trial consisted of an Intoxilyzer test result of .114 obtained four and one-half hours after the defendant had driven his vehicle and testimony that the defendant was found in his vehicle in the middle of the road in a valley blocking both lanes and with no lights on. The defendant told the investigating deputy sheriff his battery was dead, and he thought he had pulled far enough off the road to be out of traffic. The officer testified there was a strong odor of alcohol coming from the defendant, and the defendant admitted he had three beers earlier. At the scene, the defendant had failed a field sobriety test.

One panel member wrote a concurring opinion. That judge did not believe the evidence cited by the majority, other than the Intoxilyzer test result, showed that the defendant was driving with a breath-alcohol concentration of .08 or more. But the judge cited *State v. Armstrong*, 236 Kan. 290, 689 P.2d 897 (1984), which referred to studies indicating that peak alcohol level may be reached from 40 to 70 minutes after

15

consumption and subsequently alcohol is eliminated from the system. 25 Kan. App. 2d at 441.

Here, Larkin's blood-alcohol level was more than twice the legal limit about an hour and a half after she drove her vehicle. She had difficulty putting her vehicle into park. She failed two nonstandard sobriety tests and two standard field sobriety tests. While we can conceive of other scenarios involving much lengthier time periods and more marginal blood-alcohol test levels which might necessitate expert testimony to establish that there was at least a .08 blood-alcohol level at the time of driving, those are not the circumstances in this case. Under the facts here we believe there was ample evidence from which the jury could find Larkin guilty of DUI under K.S.A. 8-1567(a)(1) beyond a reasonable doubt.

*Allegations of judicial misconduct*

In her next issue of appeal, Larkin cites numerous statements made by the district court that she contends amount to judicial misconduct.

Appellate courts have unlimited review over allegations of judicial misconduct. *State v. Moyer*, 302 Kan. 892, 920, 360 P.3d 384 (2015). An appellate court must review the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct. If a proper and reasonable interpretation will render the judge's remark unobjectionable, the remark cannot be found to be prejudicial. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). The "[m]ere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment." *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002). The party alleging judicial misconduct bears the burden of establishing that misconduct occurred and that the misconduct prejudiced the party's substantial rights. *State v. Hudgins*, 301 Kan. 629, 637, 346 P.3d 1062 (2015).

16

The district court judge is not only a moderator of the trial. The judge should endeavor to conduct the trial in an atmosphere of impartiality and, therefore, should refrain from remarks or conduct that may injure a litigant. The judge should be the exemplar of dignity and impartiality, should exercise restraint over personal conduct and statements, should avoid personal predilections, and should control personal emotions. The judge should not permit any person in the courtroom to embroil him or her in conflict. The judge should avoid behavior that tends to demean the proceedings or to undermine the judge's authority. When it becomes necessary during the trial to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, those comments should be made in a firm, dignified, and restrained manner, avoiding repartee. The judge's comments and rulings should be limited to what is reasonably required for the orderly progress of the trial and should refrain from unnecessary disparagement of persons or issues. Pervasive judicial misconduct in a criminal case impairs the defendant's right to a fair trial. *State v. Hayden*, 281 Kan. 112, 123-26, 130 P.3d 24 (2006).

Larkin admits she did not make any contemporaneous objections to the district court's comments of which she now complains. But an allegation of judicial misconduct is reviewable on appeal despite the lack of a contemporaneous objection when the defendant claims that the right to a fair trial was violated. *Kemble*, 291 Kan. at 113.

Larkin first complains that, at the beginning of the motion to suppress hearing, the district court judge stated that the hearing was "'his fun for today.'" The full context of the judge's statement was as follows:

> "[DEFENSE COUNSEL]: Thank you, Your Honor. Your Honor, there's quite a congregation outside. Ms. Larkin is not present.
> "THE COURT: Yes, I bet there is quite a congregation outside with our hearing that's supposed to start after this.

17

"Well, if you feel that you need your client here to proceed, I guess we could wait, but I know we're—as far as I'm concerned, we're just on for this motion.

"I've obviously read all the briefs and at least I think I'm familiar with what the Supreme Court did last Friday, I guess I'll characterize it that way, and, quite frankly, Counsel, this is my fun for today."

From this statement, it appears the judge was eager to get started. The Supreme Court had just published the much-anticipated *Ryce* and *Nece* decisions the week before, ruling unconstitutional the Kansas implied consent law. The statement is obviously light-hearted, but there we find nothing improper about it. The district court's comment can easily be construed in an unobjectionable manner.

Larkin next complains about one of the judge's questions during her counsel's argument at the motion hearing. Defense counsel was complaining that Larkin was forced to attempt the one-leg stand test on a slanted road, on a crack in the pavement, and in windy conditions. The judge asked:

"Counsel, can I ask you, though, what would you have this officer do?

. . . .

"If he takes her to the station to do the tests, then you're going to argue that he'd already arrested and confined her. Obviously, in many cases, the testing conditions won't be ideal, so what should the officer do?"

The judge's question was reasonable, and we believe it clearly did not approach misconduct.

Larkin next complains that, in referencing the State's failure to raise the good-faith exception, the judge stated "'they didn't think they needed it'" and "'hint, hint.'" Once again, Larkin misses the context in which the judge's statement was made. The judge stated:

"This is a tough situation, and *Nece* directly deals with the DC-70 [form], and it is a difficult situation to contemplate, especially when the Supreme Court, through our departmental justice, has that lengthy decision, and then at the very end raises the good-faith exception as, well, there is the good-faith exception, but it really wasn't briefed. The State didn't brief it because they didn't think they needed it or whatever, so we're not going to go there, but hint, hint, I guess, what's the litigation that follows after this?"

In context, the judge was referring to the *Nece* decision and summarizing what the Kansas Supreme Court said in that decision, i.e., that the State had failed to raise the good-faith exception in *Nece*, but the court hinted that it could apply in future cases if the State raised it. We do not read this as the judge referring to the State's failure to raise the good-faith exception in this case.

Larkin contends the judge stepped out of line when he stated, regarding his raising the good-faith exception sua sponte, that he was "'duty bound to enunciate his views on rapidly evolving law'" and someone "'smarter than I would have to decide it'" and "'it becoming a very litigious thing.'" In context, Larkin was arguing that the district court could not raise the good-faith exception sua sponte and that the good-faith exception did not apply because the Legislature did not make a good-faith attempt to pass a constitutional law so the officer could not have reasonably relied on it. The judge responded:

"Indeed, it wasn't raised by the State. However, the Court feels especially, in this rapidly evolving situation, duty-bound to enunciate its view of the law.

"As far as the legislature, you're right that factor is one of those, but somebody much smarter than I am would have to decide that because we also have the converse of that: The acts of the legislature must be considered to be constitutional and that they act in a constitutional manner.

"There were other states that had adopted very similar laws, and there often are these waves that go through our legislatures.

"That has become a very litigious thing, but it is also frequent that merely attacking legislative enactments and then arguing they weren't unconstitutional is becoming an increasing pattern, particularly in this state, and then suddenly it's the legislature's fault for having done the people's business.

"I understand that factor. I think you'd have to go pretty deep into the legislative history and what was going on when it was passed and what other states had passed it.

"I think this Court at this level must assume that the legislature acted for constitutional purposes, and we'll just—that's obviously in the record on this one."

Larkin is absolutely correct in complaining that the district court judge raised the good-faith exception sua sponte, as we discussed above. And she also may legitimately disagree with the reason the court gave for raising the good-faith exception, but the judge's statements do not in themselves constitute misconduct. The judge was commenting on having to rule on a novel issue of law. Larkin argues that the court was allowing a political view to sway his judgment. But the judge's statements need not be cast in a political light. Indeed, panels of this court have cited the fact that other states have adopted and upheld similar laws as a reason for applying the good-faith exception in this context. See, e.g., *Schmidt*, 53 Kan. App. 2d at 236.

Larkin also contends the district court engaged in misconduct by making several statements in its order denying the motion to suppress. The order stated, in relevant part:

"The Court believes that given the rapidly approaching trial and the State lacking the time to respond on such short notice it is appropriate to consider the 'good faith exception.' Further, it was the Defendant who cited a case mentioning this point of law as part of the issue raised in the motion to suppress. Judge Malone has also put this point of law in a published opinion, finding it to be a 'pure legal question.' The Court cannot be blind to this. The Court has reviewed the authorities cited by the Defendant concerning *sua sponte* issues, but has yet to find one directly addressing this situation. A number of the cases cited are far afield from the concerns raised here."

20

Larkin's point is another iteration of her previous argument that the district court was not impartial by raising the good-faith exception on behalf of the State. Larkin may rightly disagree with the court's decision, but the court's ruling does not show partiality by the judge. The court cited Judge Malone's concurrence in *Nece*, 303 Kan. at 897, similarly raising the good-faith exception.

Larkin next contends that the district court judge made several comments during the trial which "in the transcript may seem ordinary but given the inflection and context at trial were objectionable." We obviously cannot review the judge's inflection, but we can review the content and context of the statements.

Larkin complains that the judge told her counsel, "'If that's where you're going, you're sure not doing a very good job,'" regarding the defendant's opening statement. After Larkin's opening statement, the parties approached the bench, out of the hearing of the jury, and the State objected that Larkin was arguing the case as if she had been charged under K.S.A. 8-1567(a)(3) (under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle). Larkin's counsel responded that the defense was asking the jury to look at how Larkin was acting and then question the validity and credibility of the test result. The judge responded:

> "All right. If that's where you're going, you're sure not doing a very good job. It sure sounds like you're putting on a per se case. But I get it. I understand what you're thinking, and we'll just see how the case presents. I see what direction you want to go, but there's a line there where you're coming off close to seeming to say your theory of your case is to ask the jury to disregard the instructions. But I'm not saying you've crossed it or anything, so we'll just see how the case rolls around."

The judge's comment could have been phrased better. But the court was ruling on the State's objection, and it was out of the hearing of the jury. The court ruled in favor of the defense on the objection and gave defense counsel a heads up that the opening statement

was confusing. Inartful comments, in and of themselves, do not automatically amount to misconduct. While this colloquy with counsel was awkward, it resolved the objection and moved the trial along without prejudicial effect.

Larkin next complains that her counsel was reprimanded while having issues with the video equipment at trial. Larkin wanted to play pieces of the video of the traffic stop, but she did not know how to get it to play on the court's equipment. The judge stated, outside of the jury's presence:

> "We'll get this played, but, counsel, if you have exhibits that you want to use, you need to prepare in advance, make sure the courtroom can accommodate your needs, and practice the—what you want to do.
>
> "Obviously, I'm going to let you do it and all, but I practiced law for 20 years, and the number one thing before trial is you run your traps, you run everything you want to use. You don't know what the State's going to do. You don't know what—you need to know what you're going to do, and you bring your own equipment if necessary or check in advance if you have the equipment.
>
> . . . .
>
> "This is not for counsel for the State. I'm just saying to defense counsel, when it comes to exhibits, you assume nothing. You play it in advance. I spent 20 years in the courtroom, and that's what I did every time, because you can't trust anybody to do anything for you or that anything will work at a particular time.
>
> . . . .
>
> "We're going to work our way through this as best we can. But I just think you should have been better prepared for this particular situation, and we'll see how far this goes; but keep in mind that this is a per se case and not an incapable of safely driving case, and while some of this may be of interest, it's primarily not."

Nothing the judge said constituted judicial misconduct. The district court must control the proceedings and has broad discretion and leeway to do so. *Kemble*, 291 Kan. at 114.

Larkin complains that the judge told defense counsel not to "'object to the answers you get from your own questions.'" On cross-examination, defense counsel asked Deputy Wohlin a question. The deputy responded. Then defense counsel stated, "That's not your testimony you just gave, Deputy." The State objected that the defense was arguing with the witness. The judge stated, "Yeah. Don't object to the answers you get from your own questions." In context, judge's response was clearly appropriate. The comment made by defense counsel was argumentative and not a question.

Larkin next complains about the district court's comments regarding defense counsel reading the deputy "'the whole damn liquor cabinet.'" On cross-examination, defense counsel asked the deputy whether he occasionally drank alcohol. In a series of questions, defense counsel asked if the deputy drank whiskey, vodka, gin, wine, stout beer, and lager beer. Defense counsel asked if the deputy could smell the alcohol in gasoline. The State objected to relevance. The parties approached the bench outside the hearing of the jury. Defense counsel then asked for judicial notice on hand sanitizer, isopropyl alcohol, and Listerine. The judge asked, "What's your point?" Defense counsel argued that the deputy needed to be able to identify the smell of alcohol because he had testified that he smelled alcohol on Larkin. The following exchange occurred:

"THE COURT: I get that. You read him the whole damn liquor cabinet, and I understand that; but how does it matter? He thinks he smelled alcohol. Whether she's drinking gas or having rum, he said she smelled of alcohol. That's what he operated under. How does it matter if you're going to speculate about what other smells he's familiar with?

"[DEFENSE COUNSEL]: Your Honor, the officer[] testified that the only alcohol he smells he can recognize is Bud Lite. That's it. So if he were to say, 'I smelled alcohol,' if I have him on the stand, and he can only detect Bud Lite, then any other type of alcohol—

"THE COURT: Do you have any Bud Lite? Are you going to have him test that in regard to something else?

23

"[DEFENSE COUNSEL]: No, Your Honor. That would be illegal in court, so I was bringing legal alcohol in place of it.

"THE COURT: We're not going there. You've talked about enough, you've opened up the liquor cabinet, fine. You talked a little bit about gasoline, fine."

Once again, the judge could have been considerably more artful in his word choice. He was clearly struggling to control his exasperation with defense counsel's line of questioning. But since this was done outside the presence of the jury, any damage done by intemperate comments by the judge at worst constituted minimal impropriety. Additionally, we note that Larkin does not argue that the court erred in its ruling. We do not find the judge's comments to constitute misconduct.

Larkin next argues the judge committed misconduct by stating that a witness was "'creaming the defense.'" Outside of the hearing of the jury, the State objected to the defense playing little snippets of the video. The judge commented,

"Well, quite frankly, counsel, it appears that Deputy Wohlin is creaming the defense. Any time they pull up one of their things, he explains exactly what's going on. Sorry. That's my observation. But I'm going to allow them to continue to play the segments, and I'm going to allow Deputy Wohlin to continue to cream the defense over it."

The judge's statement here was flippant and unnecessary. While not extreme in nature, it was improper in content because the district court was stepping out of its role as impartial arbiter to express an uninvited value judgment as to the quality of the evidence. But it was outside of the hearing of the jury, and the court did rule in favor of the defense on the State's objection. Under the circumstances, it was an impropriety which did not rise to the level of prejudicial misconduct.

Larkin next complains the judge commented that the defense was trying to "'bootstrap'" in information from a witness. On cross-examination, defense counsel asked the deputy if he was familiar with studies concerning confirmation bias by officers when conducting field tests. The deputy responded that he was not familiar with the term confirmation bias and had never read any studies on it. Defense counsel then started to ask, "Deputy, are you familiar with studies that would indicate that 50 percent of people—." The State objected, and the parties approached the bench outside of the hearing of the jury. The judge stated, "You guys are going to make me have to replace the carpet over here," because there had been so many objections. The State objected to the defense counsel throwing a bunch of information into his question that the jury should not hear. The judge stated that counsel could ask the deputy if he was aware of a study concerning the walk-and-turn test. But counsel could not give statistics in its question because "all you're doing is trying to bootstrap that in from the witness who doesn't even know what you're talking about, so you can pepper it into the transcript. It doesn't make any sense. Ask him if he knows about any study. If he says yes, then you can delve a little bit deeper." Here, it appears the judge hit the nail on its head. The judge did not commit misconduct by calling the defense out for exactly what it was doing:  trying to bring in or "bootstrap" evidence in through a witness who was clearly not qualified to answer the questions. We find no impropriety in the district court's comments.

Larkin next complains that the judge asked how many more questions the defense had on a certain topic. In attempting to show the machine testing Larkin's blood for alcohol content could have erred, defense counsel asked the forensic scientist witness a series of questions to see if she had checked certain parts of the computer to ensure it was working properly. The State objected to relevance. The judge asked, "How many more of these questions do you have? There are a thousand parts for the computer." There was nothing whatsoever improper about the question to defense counsel because it was in response to the State's objection and was reasonably related to the court's duty to control the proceedings and move the trial forward. The following comment about the number of

25

parts was arguably unnecessary. But although a district court must be careful not to display annoyance at counsel's method of questioning a witness, we find nothing overtly improper about the court's question.

Larkin complains about the judge's comment to the jury after the State had rested. Defense counsel requested the court to take up some motions outside the presence of the jury. The judge stated, "Sure. We'll do that. The standard ones, I assume." The judge sent the jury out by saying, "All right, ladies and gentlemen, we're getting close to the end here. There's something we need to take up with defense counsel. It won't take but a few minutes, but there's no reason for you to have to deal with that." Larkin complains that in response to Larkin's motion for a directed verdict, the judge said, "All right. Your motion is noted. Motion denied. Anything else?" Larkin also complains that, after defense counsel commented that he did not want the State to think they were springing an argument on her, the judge said, "Well, I'm not sure if the State's completely accused you of that, and I've always assumed that the defense is allowed to do trial by ambush to some extent. Just part of the game." Although a critic could readily complain that the district court was treating an important stage of the proceedings in a dismissive and facile manner, none of the judge's comments come close to judicial misconduct.

Finally, Larkin complains that, during the sentencing hearing when the court took up her motion to reconsider the directed verdict, the judge stated, "I have no doubt you're a smart lawyer, but the Court's somewhat skeptical of how such an argument could only come to exist and be considered after all this time, given the efforts that DUI lawyers have been making all this time." The judge later states in making his ruling,

> "My personal reaction after considering the argument, the best way to encapsulate—and this is not meant as an insult—but having recently attended the show and listened to the soundtrack again, I just can hear 'Razzle-Dazzle,' Billy Flynn, *Chicago*, and, quite frankly, that's what I find the argument to fit more in that category."

Again, the judge should have phrased his reason for denying the motion more artfully. This kind of glib commentary is distracting and not reflective of careful judicial analysis. But the court did not deny Larkin's motion on razzle-dazzle alone. The judge went on to explain that the phrase "any competent evidence" in subsection (a)(1) was clear and was meant to cover the waterfront and include any type of admissible evidence. As explained above, this was a reasonable interpretation of the statute.

In summary, most of the comments cited by Larkin as judicial misconduct are completely innocuous. A couple of times, the judge improperly gave his personal opinion—by stating "you're sure not doing a very good job" and that a State's witness was "creaming the defense." However, both comments were outside the hearing of the jury. And both times the court ruled in favor of the defense over the State's objection. Larkin had the burden of establishing that misconduct occurred and that the misconduct prejudiced her substantial rights. See *Hudgins*, 301 Kan. at 637. Larkin has not met her burden to show how her substantial rights were prejudiced.

After carefully reviewing the comments and actions of the district court in this case, we ultimately conclude that none of the complained-of actions or comments of the district court judge arose to the level of prejudicial judicial misconduct. But we would be less than candid if we did not express our concern that some of those comments and actions were entirely unnecessary, could easily have been avoided, and by their very nature virtually invited claims of error on appeal.

Every case is unique, and district courts are given wide latitude in determining how to handle them. But decisions like *Hayden*, cited above, reflect the gold standard for judicial patience and dignity which parties have the right to rely on in every case.

27

*Illegal sentencing allegations*

Larkin briefly argues that her sentence is illegal because the State did not provide any evidence of Larkin's prior DUI convictions. She contends the State failed to provide a certified driving history or the dates of the prior DUIs.

Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which the appellate court has unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016).

Larkin did not preserve this issue for review. A challenge to the inclusion of a prior misdemeanor DUI in a defendant's criminal history for purposes of enhancing the defendant's sentence should be preserved for appeal by an objection on the record at sentencing. *State v. Key*, 298 Kan. 315, 323, 312 P.3d 355 (2013).

Moreover, the State met its burden. Except to the extent disputed, "the summary of the offender's criminal history prepared for the court by the state shall satisfy the state's burden of proof regarding an offender's criminal history." K.S.A. 2015 Supp. 21-6814(b). A PSI report was introduced at sentencing. Larkin did not object. The PSI report listed two DUI convictions from Shawnee County on October 30, 2004, and August 3, 2005. Her sentence was not illegal.

Affirmed.